# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PAUL S. BUDDENHAGEN, Individually and on Behalf of All Others Similarly Situated, and Derivatively on Behalf of MARITIME EXPLORATIONS, INC., | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2019-0258-NAC |
| BARRY L. CLIFFORD and THE ESTATE OF ROBERT T. LAZIER, | ) ) ) ) | |
| Defendants, and | ) ) | |
| MARITIME EXPLORATIONS, INC., a Delaware corporation, | ) ) ) | |
| Nominal Defendant. | ) ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: October 24, 2023
Date Decided: May 10, 2024

Richard L. Renck, Tracey E. Timlin, Michael B. Gonen, DUANE MORRIS LLP, Wilmington, Delaware; *Counsel for Plaintiff Paul S. Buddenhagen.*

Samuel T. Hirzel, II, Gillian L. Andrews, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; *Counsel for Defendants Barry L. Clifford and The Estate of Robert T. Lazier.*

Peter B. Ladig, BAYARD, P.A., Wilmington, Delaware; *Counsel for Nominal Defendant Maritime Explorations, Inc.*

**COOK, V.C.**

The plaintiff is a sophisticated business consultant, the former director of a publicly traded corporation, and a stockholder of Maritime Explorations, Inc. ("MEI"). MEI holds significant rights in the only identified pirate shipwreck ever discovered—the *Whydah Galley*—and has worked to excavate the wreckage with varying levels of success.

The plaintiff brings this action to challenge (1) specific incidents of alleged fiduciary misconduct by MEI's two directors (the defendants) over the past three decades and (2) an allegedly unfair 2018 merger (the "Merger") that the defendants caused MEI to enter and for which the plaintiff seeks rescission.

Despite being on inquiry notice of his potential non-Merger claims many years prior, the plaintiff did not act. And for 23 years, while roosting atop his claims, the plaintiff continued his slumber. In that time, the defendants have become severely prejudiced in their ability to mount a defense. Indeed, among other things, two individuals who would have been key witnesses died. This includes one of the two defendants in this action. Likewise, a flood destroyed many of MEI's documents and records several years before the plaintiff initiated this action.

It would undermine the equitable principles embodied in the doctrine of laches to find for the plaintiff on the claims challenging acts that took place decades ago. Among other things, those principles are concerned with the natural decay of evidence over time and a defendant's ability to mount a defense with available evidence. That is, with the passage of time comes the increasing risk that evidence that may have once been available to prove a defendant's case has succumbed to the destructive forces of nature. Indeed, under circumstances like these, such delayed claims pose a substantial risk of unjust outcomes. There is a serious risk that a defendant will be held liable either because he bears the burden of proof and can no longer obtain exonerating evidence or, more perniciously, because only the evidence damning him was, by chance alone, not the subject of decay. Delaware law thus compels me to reject the plaintiff's delayed claims.

The plaintiff awoke to raise these claims only after learning that the defendants caused MEI to merge with an entity the defendants owned. The defendants undertook the Merger in anticipation of a significant payout and their belief they were close to uncovering the "mother [l]ode." Lacking any semblance of fair process and no reasonable metric for evaluating the fairness of the price, the defendants used the Merger to grant themselves additional equity and to extract rights to a substantially greater share of the *Whydah* assets, all to the detriment of the minority stockholders. Under the facts

2

presented here, the plaintiff prevails on this timely Merger claim, and rescission is the appropriate remedy.

## I.    FACTUAL BACKGROUND

The preponderance of the evidence supports the following findings of fact.[1]

### A. Parties

Plaintiff Paul S. Buddenhagen held 1,450,000 shares of stock in nominal defendant MEI.[2]

Defendant Barry L. Clifford is MEI's founder and only current director.[3]  At all relevant times, Clifford has served as a director on MEI's board (the "Board") and has been MEI's largest stockholder.[4]

Former defendant Robert T. Lazier (together with Clifford, "Defendants") also held stock in MEI and served as a director on the Board from MEI's founding until his death during the pendency of this action in

---

[1] Joint trial exhibits are cited as "JX___," trial testimony is cited as "TT___ ([Name])," and depositions are cited as "[Name] Dep. ___."

[2] *Buddenhagen v. Clifford*, C.A. No. 2019-0258-NAC, Docket ("Dkt.") 184, Joint Pre-Trial Stipulation and [Proposed] Order ("Pre-Trial Stip.") ¶ 1.

[3] *Id.* ¶ 2.

[4] *Id.*

April 2020.[5] Following Lazier's death, his estate replaced him as a defendant in this action.[6]

### B. MEI's Formation

Clifford is an explorer. His exploration—specifically of the *Whydah Galley*[7] pirate ship—has led to this litigation. The *Whydah* sank off the coast of Cape Cod in 1717 while under the command of the pirate Sam Bellamy.[8] Aboard, so it is rumored, were chests of money and treasure from at least 53 other vessels the *Whydah*'s crew had robbed.[9] The *Whydah* lay on the ocean floor for over 250 years until 1982, when Clifford discovered debris off the coast of Massachusetts while operating his company Maritime Underwater Surveys, Inc. ("MUS").[10] Believing the debris to be from the *Whydah*'s wreckage, Clifford, through MUS, initiated and succeeded in a federal

---

[5] *Id.* ¶ 3.

[6] *Id.*

[7] In their briefing and the Pre-Trial Stip., the parties refer to the ship as the "*Whydah Galley*." But numerous sources in the record, including descriptions of the name inscribed on the *Whydah*'s bell, suggest the original spelling was "*Whydah Gally*." *See, e.g.*, JX1112 at 4; JX0045 at 1; JX0260. *But see* TT134:10–17 (Clifford); JX0351 at 340; JX0780 at 3, 41.

[8] Pre-Trial Stip. ¶ 4. Before its capture by Bellamy, the *Whydah* was used "in the transatlantic trade in the enslaved." *Id.* ¶ 6.

[9] *See, e.g.*, JX0620; JX1039; JX1034 at 32.

[10] Pre-Trial Stip. ¶ 7.

admiralty action in which he sought sole title to the *Whydah*.[11]  In May 1983, while the admiralty litigation was ongoing, Clifford formed MEI to facilitate his excavation of the *Whydah* wreckage.[12]

After forming MEI, Clifford and MUS assigned their rights in the *Whydah* to MEI.[13]  Then, Clifford sought equity financing through MEI to fund the *Whydah*'s costly excavation.  As a result of these efforts, MEI raised over $1 million in financing through two private placements between 1983 and 1986.[14]  In addition to the stock issued through the private placements, MEI also issued stock to compensate those involved in its excavation and business operations.[15]  MEI continued this practice for many years.  These individuals—the participants in the private placements and those MEI compensated with stock for their services—are MEI's minority stockholders.[16]

---

[11] *See id.* ¶¶ 8, 16–17.

[12] *See id.* ¶ 9; JX0005 at 6.

[13] JX0003.

[14] *See* JX0005; JX0027.

[15] TT264:20–265:18 (Clifford); *see, e.g.*, Pre-Trial Stip. ¶ 1.

[16] *See* JX0324.

Since its inception, MEI has recovered roughly 15,000 coins.[17] Although Defendants "haven't found the mother lode yet," the coins they have recovered remain the "world's only pirate treasure."[18] Along with the coins, Defendants have recovered many other artifacts, including cannons, guns, and the *Whydah*'s bell.

### C. The Whydah Joint Venture

The financing from the private placements did not last long, and Clifford soon found himself, again, in need of funding to facilitate his dives on the *Whydah* site. Shortly after the 1986 placement, Clifford met investors Tom Bernstein and Roland Betts.[19] After learning of the *Whydah* project, Bernstein and Betts expressed interest in participating in the treasure hunt. They suggested creating an investment vehicle through which they could

---

[17] Many documents in the record suggest MEI has recovered at least 15,000 coins. But, less than one month after the Merger in 2018, Clifford stated it would be accurate to "estimate apprx [*sic*] 20,000 coins . . . ." JX0710.

[18] TT137:8–11, 296:3–4 (Clifford); JX1136 at 13 (*New York Times* article asserting the discovery of the *Whydah* "marked the first time in history that a pirate wreck had been identified and salvaged, a contention supported by two prominent archeologists"), 18 (*New York Times* article describing the *Whydah* as the "first authentic pirate ship ever recovered"), 19 (*Wall Street Journal* article stating that Clifford had "found the first ever documented pirate shipwreck"); JX0387 ("***including the only pirate treasure in the world***") (emphasis in original).

[19] TT163:5–13 (Clifford).

invest in MEI.  Ultimately, the parties decided to create a joint venture (the "Whydah Joint Venture") between MEI and its wholly owned subsidiary Maritime Financing Co., Inc. ("MFC") on the one hand and Bernstein and Betts' company Whydah Partners Limited Partnership ("WPLP") on the other.[20]

The Whydah Joint Venture consisted of two agreements, the Joint Venture Agreement (the "JVA") and the Operations Agreement (the "OA").[21] Under these contracts, MEI assigned its rights in the *Whydah* to MFC, and MFC assigned those rights to the Whydah Joint Venture.  The parties to the JVA and OA executed both agreements in February 1987.[22]  Under the OA, the Whydah Joint Venture made certain distributions to MEI to finance its continued excavation operations.  But the Whydah Joint Venture was primarily formed between MFC and WPLP.

The parties agreed that a management committee (the "Management Committee") would govern the Whydah Joint Venture.[23]  This committee consisted of six members.  MFC and WPLP would each appoint three

---

[20] *Id.* at 164:2–16.

[21] JX0045 (JVA); JX0046 (OA).

[22] *See* JX0045; JX0046.

[23] JX0045.

members.[24] But the three members WPLP appointed had veto power and thus final decision-making authority over the Whydah Joint Venture.[25] In the JVA, WPLP agreed to raise up to $6 million to finance the excavation and conservation of *Whydah* artifacts.[26]

Four provisions in the JVA are relevant. The first deals with the division of revenues. Section 6 provides that proceeds from any "sale or other disposition" of *Whydah* artifacts and the Whydah Joint Venture's "share of revenues from the exploitation of Ancillary Rights" (collectively referred to in the JVA as "Net Proceeds") are distributed according to a sliding scale (the "Sliding Scale").[27] Under the Sliding Scale, proceeds are apportioned between MEI/MFC and WPLP in accordance with a tiered formula operating on $6 million increments.[28] Under this formulation, WPLP would receive 80% of the first $6 million in Net Proceeds from the sale or lease of *Whydah*

---

[24] *See id.*

[25] *Id.* at 13–14.

[26] *Id.* at 2.

[27] *Id.* at 1, 8. Revenues derived from the exploitation of "Ancillary Rights" include certain revenues from museums, which are addressed under Section 8 of the JVA. *Id.* at 16–18.

[28] *Id.* at 8–9.

8

artifacts and incrementally less of the marginal dollar at each rung of the ladder.[29]  The Sliding Scale is set forth below:[30]

| Column A | Column B | Column C | Column D |
| --- | --- | --- | --- |
| Level of Proceeds | Operations Fee to Explorations | Maritime | Partnership |
| $  —  6,000,000 | 20% | 0% | 80% |
| 6,000,001 — 12,000,000 | 0% | 30% | 70% |
| 12,000,001 — 18,000,000 | 0% | 40% | 60% |
| 18,000,001 — 24,000,000 | 0% | 50% | 50% |
| 24,000,001 — 30,000,000 | 0% | 55% | 45% |
| 30,000,001 — 36,000,000 | 0% | 60% | 40% |
| 36,000,001 — 42,000,000 | 0% | 65% | 35% |
| 42,000,001 — 48,000,000 | 0% | 70% | 30% |
| 48,000,001 — 54,000,000 | 0% | 75% | 25% |
| 54,000,001 — and up | 0% | 80% | 20% |

Second, Section 9 of the JVA sets forth the durational term over which the Whydah Joint Venture remains in effect.  Section 9 provides: "The term of the Joint Venture shall commence upon the date of execution of this Agreement and shall continue until December 31, 2017, unless sooner terminated in accordance with the provisions of Paragraph 15 of this Agreement or as otherwise provided by law."[31]  Thus, although the Whydah Joint Venture could terminate before the expiration of its original term, it required an amendment of the JVA to extend its term.

---

[29] *Id.*

[30] *Id.*  The JVA refers to MFC as "Maritime" and MEI as "Explorations."  *See id.* at 1, 3.

[31] *Id.* at 19.

9

Accordingly, Section 13 in the JVA outlines how the parties can amend its terms. This third provision states: "Unless provided otherwise in this Agreement, an amendment to this Agreement must be approved in writing by [WPLP] and [MFC.]"[32]

Fourth, Section 10 of the JVA specifies that neither WPLP nor MFC "have the right to retire or withdraw or to sell, transfer, assign, pledge, hypothecate, encumber, subject to a security interest, or otherwise dispose of its Joint Venture interest or any portion thereof except with the prior written approval of the other party."[33]

### D. Buddenhagen's Appointment

By May 1990, MEI's relationship with WPLP entered choppy waters. The evidence suggests that WPLP began to leverage its control over the Whydah Joint Venture, through the Management Committee, to make decisions with which Clifford disagreed.[34]

Defendants recognized they were not well-suited to negotiate with Bernstein and Betts. So, they hired Buddenhagen to negotiate on MEI's

---

[32] *Id.* at 22–23.

[33] *Id.* at 19.

[34] *See* JX0140.

10

behalf.[35]  Buddenhagen holds two business degrees from Harvard University, including a Master of Business Administration.[36]  He has an extensive background in business, worked as a business consultant for many years, and served as a member of the board of directors of a publicly traded corporation—Lydall, Inc.[37]

Buddenhagen worked for MEI from November 1991 until as late as 1996.[38]  In this role, Buddenhagen became apprised of MEI's operations by attending Board meetings and through his involvement in MEI's day-to-day operations.  MFC even appointed Buddenhagen as one of its designees on the Management Committee.

Defendants assert at various points in the record that Buddenhagen initiated this action due to some personal vendetta against Defendants that arose from the circumstances leading to the non-renewal of his consultation agreement.  It is unclear whether that is true.  I describe those alleged

---

[35] TT32:16–21 (Buddenhagen).

[36] *Id.* at 6:1–19.

[37] *See id.* at 9:16–22.

[38] Buddenhagen Dep. 71:17–23 (suggesting he is "not sure exactly when [his] work with MEI ended," but he "know[s] it ended in 1996 for sure"); TT31:12–16 (Buddenhagen) (suggesting Buddenhagen's official contractual arrangement with MEI ended in 1993).

circumstances in an effort to provide a comprehensive assessment of the parties' assertions and the spotty record before me.

At trial, Clifford stated that, notwithstanding his strong business pedigree, Buddenhagen wreaked havoc on MEI's relationship with Bernstein and Betts by using aggressive negotiation tactics and engaging in unseemly behavior. One specific incident rose above the rest. Clifford testified under oath to events that took place in a meeting at the Harvard Club. Clifford asserts that, in addition to making "anti-Semitic comments" at the meeting, Buddenhagen "exposed himself at the table, stood up and said, 'Meet One-Eyed Willy.'"[39] These events were followed promptly by WPLP's letter to Defendants asking that they remove Buddenhagen from the Management Committee.[40] Defendants acquiesced.

Buddenhagen vociferously denies Clifford's allegations and asserts they are entirely false. And there appears to be some record evidence that suggests MEI's Board decided not to renew Buddenhagen's consultation agreement, in part, because he had accomplished the goals he was hired to pursue.[41]

---

[39] TT183:13–16, 184:6–9 (Clifford).

[40] *See id.* at 181:5–184:9; JX0224.

[41] *See, e.g.*, JX1033.

12

To be clear, I am unable to determine with any remote degree of confidence what happened at the Harvard Club three decades ago. At this point, I have only the testimony of two individuals who are, to put it mildly, quite adverse to each other and interested in the outcome of this litigation.

After Clifford's testimony about the Harvard Club, Plaintiff's counsel displayed, on cross-examination, a photo of Vince Murphy, whom Clifford insisted had died some years earlier.[42] The photo pictured Murphy—who attended the meeting at the Harvard Club—holding a copy of a recently dated newspaper to prove he is alive.[43] Plaintiff's counsel suggested Murphy, now 93 years old, could "put to rest this Harvard meeting stuff" and offered to call him as a witness.[44] But since Defendants had not been afforded an opportunity to depose Murphy until that point, the parties discussed holding an evidentiary hearing after trial during which Murphy could testify.[45] Following trial, I received a status report providing that the parties would submit no further evidence.[46]

---

[42] TT309:17–311:10 (Clifford).

[43] *See id.*

[44] *Id.* at 311:18–24 (Plaintiff's counsel).

[45] *Id.* at 312:1–18.

[46] Dkt. 196.

From the time his services ended until after the Merger in 2018, Buddenhagen made contact with MEI on only two occasions. In 1996, Buddenhagen returned certain files of MEI's that he had retained from his time as a consultant; and in 2009, Buddenhagen attended a talk Clifford gave. Other than those two isolated interactions, however, MEI did not contact Buddenhagen, nor did Buddenhagen contact MEI.

### E. The 1995 Buyout

MEI once again faced financial difficulty and operated at a loss in 1990 and 1991.[47] When Bernstein and Betts invested in MEI and the Whydah Joint Venture's "treasure hunt"[48] through WPLP, they did so under the belief that MEI would excavate whatever Clifford found on the *Whydah*—hoping to hit the mother lode—and share in the profits therefrom.[49] Although some of WPLP's investment was driven by the "fun" novelty of investing in the only known pirate shipwreck, as Betts explained, WPLP's investors were also motivated by the chance that MEI "will find something."[50]

---

[47] *See* JX0228 at 1, 5–6.

[48] Betts Dep. 16:6–11.

[49] *See id.* at 50:20–51:3, 20:22–21:13, 68:21–69:2.

[50] *Id.* at 50:20–51:7.

At first, WPLP's investment in the Whydah Joint Venture "went pretty smoothly."[51] After uncovering "quite a bit of stuff,"[52] Bernstein and Betts sought to have the treasure and artifacts appraised. In 1992, Sotheby's Appraisal Company concluded, based on "the current auction market[,]" that the "current auction value" of the *Whydah* treasure and artifacts was $220,000 to $350,000.[53] "[I]mportant[ly,]" Sotheby's also noted, that "the collection as a whole might sell for more than [it] ha[d] estimated if [the collection] is . . . sold at one time. If this happens, it is difficult to estimate the collection's potential."[54] Although the Management Committee considered selling the salvaged artifacts and treasure around that time, it decided not to, believing the existing "auction market ha[d] suffered from [a] nationwide recession."[55]

Based on the Sotheby's estimate, however, WPLP believed the treasure would not ultimately amount to much.[56] So, Bernstein and Betts changed

---

[51] *Id.* at 23:10–14.

[52] *Id.*

[53] JX0207.

[54] JX0206.

[55] JX0228 at 3; JX1124.

[56] Betts Dep. 68:3–8.

course. This time, they sought to indirectly exploit the *Whydah* assets and artifacts by generating profits through ticket and merchandise sales at museums they planned to open.[57] To that end, WPLP pursued plans to create a museum in Boston, Massachusetts, to tell the "story about life on board [the *Whydah*]."[58] But, according to Betts, it "ran into a race issue in Boston where the black community felt [they] would be trivializing the slave experience on the ship."[59] Recall that before Bellamy captured the *Whydah*, it was used "in the transatlantic trade in the enslaved."[60]

Undeterred by the Boston failure, WPLP tried to open another museum in Tampa, Florida—going so far as to sign a letter of intent with the Port Authority of Tampa.[61] But again, in part a function of the "racial controversy" surrounding the *Whydah*'s history, these efforts failed.[62] After

---

[57] *Id.* at 41:20–42:8 ("our assessment was the treasure, if you will, had little or no value," so "then we had tried" to build a museum in "two major cities . . . that would tell the story of the Whydah, Boston and Tampa," but "r[a]n into the same issue in both places and determined that that was never going to happen").

[58] *Id.* at 33:24–25.

[59] *Id.* at 35:15–18.

[60] Pre-Trial Stip. ¶ 6.

[61] JX0228 at 2.

[62] *See id.*

Boston and Tampa fell through, Bernstein and Betts reevaluated WPLP's continued involvement in the Whydah Joint Venture. They believed there was no meaningful value to exploit directly and the "controversial issue of race was going to follow [the Whydah Joint Venture's museum projects] wherever [they] went."[63] Upon reaching these conclusions, WPLP promptly sought to exit the Whydah Joint Venture.[64]

To accomplish this, Bernstein and Betts sought an investor to buy WPLP's interest in the Whydah Joint Venture. Buddenhagen was aware of this at the time and discussed Bernstein and Betts' sale of WPLP's Whydah Joint Venture interest with John Begg—another early investor in MEI.[65] Although Begg later offered to buy WPLP's interest himself, Bernstein and Betts seemed focused on their negotiations with Lazier.[66]

In April 1995, Lazier paid $50,000 for an option. The option permitted Lazier to buy WPLP's interest on or before August 31, 1995, for $500,000.[67] Lazier sought to raise the requisite funds using his newly minted company,

---

[63] Betts Dep. 67:4–7.

[64] *Id.* at 41:20–42:8.

[65] JX0235 (August 1994 letter from Buddenhagen to Begg).

[66] *See* JX0238 (November 1994 letter from Begg to Bernstein and Betts seeking to buy their interest in the Whydah Joint Venture); JX0251.

[67] JX0252.

Whydah International, Inc. ("International"). But, despite calling "a million people," he remained unable to find meaningful co-investors before the option expired.[68]

Nevertheless, by December 1995, Lazier, with help from Clifford and Phillip Crane (a lender and co-investor), secured the requisite funding.[69] On December 29, 1995, International successfully acquired WPLP's entire stake in the Whydah Joint Venture (the "Buyout").[70] To effectuate this transfer of WPLP's Whydah Joint Venture interest, the parties executed an instrument (the "Buyout Agreement"), which included MFC's written consent and signature as required by Section 10 of the JVA for transfers of Whydah Joint Venture interests.[71]

---

[68] TT201:10–15 (Clifford).

[69] *See* JX0394 at 2–4, 11–12.

[70] *See* JX0273. The record suggests, in addition to the $500,000, International also provided WPLP with 681 coins from the *Whydah* as part of the consideration used to finance the Buyout. *See id.* at 2.

[71] *Compare* JX0273 at 8, *with* JX0045 at 19. After buying WPLP's Whydah Joint Venture interest, Clifford and Lazier set about to "rehabilitate[]" the *Whydah*'s story. *See* JX1015 at 12. At trial, Clifford explained that "after Boston failed" and Bernstein and Betts "sold out," MEI "brought in . . . a team of African-American scholars, and [they] made the story . . . about [the en]slave[d persons] experimenting in democracy." TT369:15–370:8 (Clifford). This gave rise to Clifford's reframing of the *Whydah*'s history. As Clifford explained, they "realized the ship . . . was carrying people to be sold in the New World," but that "once it was captured by Sam Bellamy and his crew," many of "whom were former[ly en]slave[d],"

18

## F. The Purported 1996 Board Meeting and Stock Issuances

As explained below, Plaintiff challenges whether Defendants held a statutorily sufficient amount of MEI's stock to approve the Merger. Defendants rely on documents suggesting that, at a November 15, 1996, Board meeting (the "1996 Meeting"), the Board voted to issue Clifford 300,000 shares of stock for each of his prior seven years of services.[72] These 2.1 million shares are alleged to be the difference in whether Defendants held a majority of MEI's stock at the time of the Merger.

Based on the record before me, the evidence shows that over the course of the decade following the 1996 Meeting, Defendants manipulated the corporate records by writing, rewriting, and backdating many drafts of the

---

the crew began "experimenting [with] democracy 50 years before George Washington." *Id.* at 127:1–14. A press release quoted Clifford as follows: "'These pirates were the true noble heroes of the era . . . . They treated one another as equals regardless of race or background. They were experimenting in democracy decades before our fight for independence. Their lessons are as valuable today as they were in 1717.'" JX0485 at 3. *National Geographic* picked up Clifford's reframed history of the *Whydah* and the individuals on board, and "[t]here was a huge article in the *New York Times* about it." TT208:15–209:2 (Clifford). According to Clifford, these publications "changed the whole history of the *Whydah*." *Id.*

[72] *See* Def's Post-Trial OB at 24–26; TT508:11–21 (Clifford). Although Defendants point to certain letters from Ken Kinkor for the proposition that Clifford held a majority of MEI's stock, the letters cited are accompanied by a memorandum. The memorandum, in turn, cites the "Minutes of the Board of Directors of Maritime Explorations, Inc. November 15, 1996" to support its conclusion that Clifford was entitled to a majority of MEI's stock. *See* JX0337 at 3 n.8.

minutes to suggest the Board voted to issue Clifford the 2.1 million shares in 1996. Viewing these minutes as a whole, they do not support Defendants' position on this issue.

There are 17 different sets (not counting two sets of duplicates) of draft minutes from the 1996 Meeting.[73] Only 14 of the drafts are complete—three are missing pages.[74] Of the remaining 14 drafts, only one is signed—and then only partially.[75] It is found in JX0303. Plaintiff's counsel showed through a trial demonstration that this partially signed draft of the meeting minutes—bearing only Clifford's signature and two blanks for other signatures—is likely written in Calibri font.[76] Plaintiff's counsel also suggested that Microsoft did not release Calibri font to the public until 2007—over a decade after the 1996 Meeting occurred.[77]

When confronted at trial with the demonstration, Clifford responded: "I'm -- I don't know. I just -- you know, this is something that I would -- you know, I'm not familiar with this sort of thing, and I know that these

---

[73] *See* JX0286–JX0303.

[74] *See* JX0293; JX0295; JX0298.

[75] *See* JX0303.

[76] *Id.*; TT522:9–523:23 (Clifford).

[77] TT523:6–13 (Plaintiff's counsel).

documents were going back and forth from Messerli & Kramer, they were correcting documents."[78]  But unlike other drafts that have fax markings from the law firm of Messerli & Kramer, Clifford's signed Calibri minutes bear no such markings, and there is nothing to indicate that Messerli & Kramer ever touched the document.

Plaintiff's demonstration is compelling, and Clifford's response is not confidence-instilling.  But I am not a typographer, nor does Plaintiff's counsel profess to be.  And Plaintiff presented no expert testimony or other evidence at trial supporting the accuracy of his demonstration or the assertion that Microsoft first released Calibri font in 2007.  This is ultimately a non-issue, however, since several other significant discrepancies undermine the validity of the draft minutes.  Three examples illustrate this point.

First, the drafts show a demonstrable lack of contemporaneity to the 1996 Meeting.  The earliest draft of the November 1996 minutes bears a fax marking from Messerli & Kramer—MEI's counsel—dated May 24, 1999, at "10:50."[79]  Although this first 1996 draft seems to pre-date all other drafts in

---

[78] TT522:9–523:23 (Clifford).

[79] JX0288.

21

the record, the fax markings on it post-date the 1996 Meeting by over two years.[80]

This fax marking is also the *same* fax marking—down to the exact day and minute—as the fax marking on an unsigned draft of minutes purporting to record the events of the Board's meeting on June 10, 1997.[81] The third paragraph of the 1997 minutes provides the following: "As the first order of business, the Chairman noted that the minutes of the November 15, 1996, Board meeting have been approved with each director having signed said minutes."[82] It is unclear how—over a year-and-a-half after the purported 1997 meeting took place—Messerli & Kramer could send MEI the draft 1997 Board minutes stating that the 1996 minutes were signed by all directors, while also sending—at the exact same time—an unsigned draft of the 1996 minutes.

Second, many of the draft minutes are inconsistent with each other. It may have been one thing if some drafts were simply more descriptive than others, but there are material conflicts between two groups of the minutes—

---

[80] *See id.*

[81] *Compare id., with* JX0306.

[82] JX0306.

Group 1[83] and Group 2.[84]  With help from Messerli & Kramer, Defendants created the drafts in Group 1 between 1999 and 2004.  And they created the drafts in Group 2 between 2004 and 2008.

Three of these inconsistencies bear noting.  First, unlike the drafts in Group 2, seven of the nine drafts in Group 1 suggest the Board did not vote to issue Clifford the 2.1 million shares at the 1996 Meeting.[85]  Second, all drafts in Group 1 assert Lazier proposed amending the JVA to eliminate the Sliding Scale and replace it with a fixed revenue split under which International would take home 75% of all revenues, and MEI would keep the remaining 25%.[86]  The drafts in Group 2, however, all purport to suggest the Board voted to issue Clifford 2.1 million shares and that Lazier proposed the same JVA amendment but with a 2/3–1/3 fixed revenue split.[87]  Third, the drafts in

---

[83] *See* JX0288; JX0287; JX0286; JX0296; JX0294; JX0297; JX0289; JX0290; JX0291.

[84] *See* JX0292; JX0301; JX0300; JX0302; JX0299; JX0303.

[85] *See* JX0288; JX0287; JX0294; JX0297; JX0289; JX0290; JX0291.

[86] *See, e.g.*, JX0288 at 2.

[87] At first glance, the 25–75 and 1/3–2/3 proposed amendments might seem tolerable for MEI's stockholders since under the Sliding Scale's first rung, MEI would only stand to take home 20% of Net Proceeds.  But, under the proposed amendments, MEI would give up all upside in the event the Whydah Joint Venture's cashflows exceeded the first rung of the ladder in the Sliding Scale, as might be the case if MEI uncovered treasure of significant value or sold its already significant collection of recovered treasure.  That is,

Group 2 also coincide with Defendants' initial plans to merge MEI and International. As I discuss below, Defendants began these initial plans in 2003, and the plans surfaced in a more complete form between 2008 and 2011. So, starting with the first draft in Group 2, JX0292, each draft in Group 2 explains Lazier's proposed JVA amendment as setting the stage for a future combination between MEI and International.[88]

The third example undermining the draft 1996 minutes is arguably the most alarming of all. In this example, I consider Lazier's handwritten notes describing specific changes he wanted to make to the 1996 draft minutes in or after 2004. Unlike almost all the drafts in Group 1, the earliest draft in Group 2—JX0292—suggests the Board approved a vote to issue Clifford 300,000 shares per year for each of the prior seven years. But it also suggests the Board had approved issuing 200,000 shares to Lazier and 50,000 shares to both Mickey Salloway and Vince Murphy for each of their prior seven years of services to MEI.

---

if MEI uncovered significant treasure or sold its existing collection, producing revenues sufficient to boost the Whydah Joint Venture's Net Proceeds above the first $6 million rung of the Sliding Scale, these fixed revenue splits would mean MEI gave up all the upside the Sliding Scale was designed to provide it—*i.e.*, a higher distribution of revenues on the marginal dollar. *See* JX0045 at 9.

[88] *See, e.g.*, JX0292 at 4 ("The Board also felt this simpler 2/3 / 1/3 split would set the stage for the possible future combining of the two companies.").

Around this same time, Defendants created a set of minutes for a Board meeting on April 1, 2004.[89] This set of minutes reflects that the Board approved a vote to issue Clifford and Lazier each two million shares of MEI's stock.[90] That is, 250,000 shares per year from 1997 to 2004.[91]

Defendants drafted this set of April 2004 minutes around the same time as JX0292. This is brought to light by a particularly concerning exhibit.[92] In 2014, Lazier sent himself a compilation of documents that are included in JX0394.[93] Among these documents are handwritten notes from sometime around 2004.[94]

---

[89] JX0327. *But see* JX0328.

[90] *Id.*

[91] *Id.*

[92] *See* JX0394 at 18.

[93] *See* Clifford Dep. Vol. II 13:10–14:10; JX0394 at 1.

[94] *See* JX0394 at 18. It is not entirely clear whether Lazier wrote the notes himself or they simply reflected his directions. But the context surrounding their production—being included in documents Lazier sent to himself and describing matters with which Lazier was directly involved—generally seems to support attributing the notes or their contents to Lazier. This notion is further supported by other handwritten notations that describe the JVA amendment that the draft 1996 Meeting minutes suggest Lazier proposed to the Board. *See id.* at 19. Nonetheless, there remains some degree of residual uncertainty, obviously compounded by Lazier's death and inability to testify at trial, that leads me to qualify my discussion of the record here.

These notes reflect certain changes Lazier wanted to make to JX0292 in or around 2004. Specifically, the notes suggest that Lazier wanted to "[c]hange minutes" to "[r]emove Mickey & Vince" from JX0292.[95]



Corresponding to this "[c]hange" to the minutes, it seems that Lazier struck through the Board's purported share issuances to Mickey Salloway and Vince Murphy in the draft minutes:[96]

| President | Barry Clifford | 300,000 shares |
| Vice President | Robert Lazier | 200,000 shares |
| ~~Secretary~~ | ~~Michael Salloway~~ | ~~50,000 shares~~ |
| ~~Treasurer~~ | ~~Vince Murphy~~ | ~~50,000 shares~~ |

This change is adopted in almost all the other drafts in Group 2.

Next to the "[c]hange minutes" notation and on the same page, it seems that Lazier included further notes from roughly the 2004 timeframe.[97]

---

[95] *Id.*

[96] JX0292 at 1.

[97] JX0394 at 18.

26



Here, "may need to be more from '96 to '04" seems to be a reference to the Board's meeting on April 1, 2004.[98]

I consider the timing of this in conjunction with Lazier's "[c]hange minutes" note. Together, they seem to corroborate an already remarkable point, that Defendants believed they could freely edit the substance of the draft 1996 Meeting minutes years after the fact to alter the record of key corporate actions and MEI's equity ownership.

The preponderance of the evidence in this case suggests Defendants drafted minutes in font that did not exist until over a decade after the 1996 Meeting took place and manufactured over a dozen, ever-evolving drafts of the 1996 Meeting minutes long after the meeting occurred. In doing so, it seems that Defendants tried to change the narrative in fundamental ways

---

[98] *See* JX0327.

27

throughout the various iterations of the draft minutes. This suggests Defendants saw drafting the 1996 Meeting minutes as little more than a creative writing exercise. But it also has knock-on effects. That is, these events also cause me to doubt Defendants' credibility generally, especially as it relates to their fiduciary obligations.

## G. The First Failed Merger

The preponderance of evidence shows Defendants grew interested in merging MEI with International sometime after 2003. These attempts fizzled out, but not without leaving a lasting mark on MEI's stock ledger.

### 1. Nancy Stevens' January 2003 Ledger

In early 2003, Defendants began working with Messerli & Kramer "toward[] a clean up and consolidation of the various companies holding interests in the Whydah excavation . . . ."[99] To that end, a legal assistant at Messerli & Kramer, Nancy Stevens, sent Lazier a copy of MEI's stock ledger on January 31, 2003.[100]

The ledger reflected Defendants' then-current cumulative MEI holdings as 37.63%.[101] Of the outstanding shares, Clifford held 12,778,500.[102]

---

[99] JX0394 at 2.

[100] JX0324.

[101] *Id.* at 21, 33–34.

Notably, this ledger does not reflect an issuance of 2.1 million shares to Clifford that corresponds with the Board's purported vote at the 1996 Meeting.

### 2. The April 2004 Board Meeting

It appears that on the heels of Stevens's ledger reflecting that Defendants only held 37.63% of MEI, Defendants held another Board meeting to issue themselves stock. As noted above, there is a draft set of minutes for a Board meeting on April 1, 2004.[103]

It provides that the Board voted to issue Clifford 4.1 million shares of MEI stock.[104] Of those shares, 2.1 million were for services rendered from 1990 to 1996.[105] The remaining 2 million were for services provided from 1997 to 2004.[106]

### 3. Ken Kinkor's 2008 Assessment

In 2008, Defendants upped the ante and began actively pursuing a merger between MEI and International. In March, Ken Kinkor, who

---

[102] *See id.*

[103] JX0327.

[104] *Id.*

[105] *Id.*

[106] *Id.*

29

Defendants hired to take charge of MEI's bookkeeping, set to work.[107]  Before his untimely death in 2013, Kinkor played a significant role in shaping MEI's stock ledger.[108]

On September 1, 2008, Kinkor sent a letter to Lazier stating that after looking "through assorted records and minutes" he believed Clifford should be issued 4.1 million additional shares "to get him current with the" prior "MEI Board votes."[109]  He reached this conclusion based on his purported understanding that, although the Board in 1996 and in 2004 had approved votes to issue Clifford a total of 4.1 million shares, those shares had never actually been issued.[110]  One draft of that letter is accompanied by a memorandum containing the sources of information Kinkor used in reaching his conclusions.  The memorandum specifically cites to Stevens's ledger and purported minutes from the Board's meeting on November 15, 1996.[111]

---

[107] *See* TT148:15–19 (Clifford); JX0337 at 13.

[108] Kinkor was survived by his wife, Marti Kinkor, who continued her late husband's bookkeeping services for MEI and the Cliffords.

[109] JX0561; JX0337.

[110] *See* JX0561; JX0337.

[111] *See* JX0337 at 3 nn.1 & 8.

### 4. Kinkor's 2009 Merger Plan

Kinkor's September 2008 letter goes hand-in-glove with two of his later documents, both titled "2009 MEI/WI Stock Analysis," which he prepared at the end of 2008.[112] Kinkor designed these documents as a blueprint for conducting a merger between MEI and International.[113]

Both documents contain a similar assortment of tables. The first two tables in both documents are identical.[114] The first table reflects the "Current MEI Certificates Issued."

|          | # of Shares | % of Ownership |
|----------|-------------|----------------|
| Clifford | 12,778,500  | 31.19          |
| Lazier   | 2,640,000   | 6.44           |
| Other    | 24,778,000  | 62.37          |
| (Total)  | 40,986,879  | 100%           |

The second table reflects "Adjustments Per Previous MEI Board Votes" or shares that were "Already Authorized" but "not yet issued."[115]

---

[112] *See* JX1029; JX1030. At the top of the first document, Kinkor wrote by hand, "[l]et me know if this needs to be adjusted[.] Thanks[.]" JX1029. At his deposition, Clifford identified this handwriting as "Ken's." Clifford Dep. Vol. II 127:6–22. Defendants also attribute JX1029 to Kinkor. Def's Post-Trial OB at 25.

[113] *See* JX1029 ("Once these shares are actually issued, a legal vote to offer to roll up MEI into WI can then be taken.").

[114] *Compare id., with* JX1030.

[115] JX1029; JX1030. The table providing this information reflects an addition of 4.6 million shares to Clifford's holdings in the first table. Of these shares, 4.1 million represented the Board's purported votes at the 1996

31

| | # of Shares | % of Ownership |
|---|---|---|
| Clifford | 17,378,500[1] | 35.80 |
| Lazier | 6,040,000[2] | 12.44 |
| Other | 25,128,000[3] | 51.76 |
| (Total) | 48,546,500 | 100% |

These tables are followed by step-by-step instructions that culminated in "a legal vote to offer to roll up MEI into WI."[116]

### 5.    The January 2009 Board Meeting

In early 2009, Defendants undertook Kinkor's plan. The Board, comprised of Clifford and Lazier, met on January 6, 2009, with Clifford's attorney, Allen Tufankjian, in attendance.[117] Clifford and Lazier, as the Board, signed and finalized these minutes.[118] The minutes record Board votes to "reaffirm[]" the purported vote at the 1996 Meeting to issue Clifford 2.1 million shares.[119] Importantly, in "reaffirming" the issuance, the minutes

---

Meeting and the Board's vote at the meeting on April 1, 2004. The remaining 500,000 are shares the Board purportedly voted to issue Clifford to reimburse him for shares he transferred to Buddenhagen. The 500,000 shares are not in dispute.

[116] JX1029; JX1030.

[117] JX0340.

[118] *Id.*

[119] *Id.*

of the 2009 meeting also record that the Board "resolved that the Company will issue" the shares "forthwith."[120]

The Board repeated this process for the April 1, 2004, Board meeting, reaffirming the Board's 2004 vote to issue Clifford 2 million shares for his services from 1997 to 2004. In each instance, the 2009 meeting minutes again followed the "reaffirm[ance]" with the phrase "and it was resolved that the company will issue" the shares "forthwith."[121] Other evidence in the record also supports the notion that during the April 2004 Board meeting, the January 2009 meeting, or another Board meeting on December 29, 2009, the Board voted to issue Clifford the 2.1 million shares and then MEI actually issued the contested 2.1 million shares to Clifford.[122]

---

[120] *Id.*

[121] *Id.*

[122] *See id.*; JX0346. On February 10, 2010, Kinkor sent a letter to Stevens portraying the events of another Board meeting held on December 29, 2009. JX0346 at 1. In that meeting, it appears the Board voted to make several other stock issuances—including an issuance of 2 million MEI shares to Clifford. *Id.* Stevens responded that same day, describing a conversation in which Stevens and Kinkor appear to have reached a determination of MEI's majority ownership. *See id.* at 7.

33

### 6.     A Corresponding Stock Certificate

A stock certificate ("Certificate 1370") in the record suggests MEI issued Clifford 2.1 million shares on November 15, 1996.[123]   But this certificate is signed by Kim Ruotolo in her capacity as MEI's secretary.[124]   In this regard, the signature conflicts with the draft 1996 Meeting minutes, which identify Salloway as MEI's secretary, not Ruotolo.[125]   This follows because the Board did not elect Ruotolo as MEI's secretary until the April 2004 meeting.[126]

The appearance of Ruotolo's signature on the certificate is consistent with the draft April 2004 minutes.[127]   As noted, that draft provides that the Board voted in April 2004 to issue Clifford 2.1 million shares for his services from 1990 to 1996.[128]   This is also consistent with the notion that, although Certificate 1370 is backdated, the Board actually did vote to issue Clifford the

---

[123] JX1168.

[124] *See id.*

[125] *See* JX0286–JX0303.

[126] *See* JX0327.

[127] *See id.*

[128] *See id.*

34

disputed 2.1 million shares in 2004 or 2009. And, following one of those votes, MEI issued Certificate 1370 to Clifford.

This understanding is reinforced by Stevens's conclusion in a September 2010 letter to Lazier and Kinkor. There, Stevens—now a paralegal—concluded that "Barry holds a 50.71% interest in the Company (26,640,615 shares)."[129] Erik Bergman—MEI's transactional counsel for the 2018 Merger—reached the same conclusion in May 2017.[130] And, in the weeks following the Merger, Bergman sent Clifford an email that included a table of Clifford's pre-Merger MEI stock certificates and the date MEI issued the certificates.[131] The table shows MEI issued Clifford Certificate 1370 for 2.1 million shares on April 1, 2004.[132]

Although Defendants' efforts to push for a merger dissipated in the years that followed the January 2009 meeting, these changes to MEI's stock ledger play a significant role in my assessment of the present dispute.

---

[129] JX0394 at 17.

[130] JX0573 (stating that Clifford held 50.71% of MEI's outstanding stock and was thus "the controlling stockholder of MEI").

[131] JX1177.

[132] *Id.*

**H. Other Entities**

Prior to the Merger, MEI and International slowed their operations. By 2016, Defendants ran most of the Whydah Joint Venture's business through a new company, Historic Shipwrecks, Inc. ("HS").[133]  In addition to HS, three other entities are relevant—Maritime Heritage Research Labs, LLC, Clifford Explorations, LLC, and 16 MacMillan Wharf Realty Trust.

**1.  Historic Shipwrecks**

In 2006, a company called Arts & Exhibitions International, LLC ("AEI") approached Clifford, seeking to use *Whydah* artifacts as part of a traveling pirate exhibit (the "Real Pirates" exhibit).[134]  Defendants formed HS to facilitate their efforts to take advantage of this opportunity.  Clifford and Lazier each held 50% of HS's equity.[135]  At trial, Clifford asserted the use of HS in this transaction was purportedly inspired by AEI's unconfirmed preference not to contract with MEI due to MEI's outstanding debt.[136]

---

[133] JX0450.

[134] *See* JX0330; TT415:20–416:3 (Clifford).

[135] *See* JX0449 at 1.

[136] TT240:8–19 (Clifford).

36

On August 3, 2006, AEI sent Clifford and HS a letter of understanding and agreement, which Clifford signed.[137] The parties finalized this in a rights agreement dated December 22, 2006 (the "AEI Rights Agreement").[138] Clifford signed the AEI Rights Agreement twice—as HS's president and in his personal capacity.[139] After they executed the AEI Rights Agreement, the parties amended it on three occasions between September 2008 and March 2010.[140]

In apparent tension with the terms of the JVA and OA, the first provision of the AEI Rights Agreement provides that "Clifford [and HS] have represented that they own the complete salvage, [and] ownership and possession rights to all artifacts recovered to date from the wreck of the Whydah."[141] By contrast, the OA provided that the Whydah Joint Venture— not HS and not Clifford—had "sole discretion" to make "any portion of the" *Whydah* artifacts "available for exhibition in a museum."[142]

---

[137] *See* JX0330.

[138] JX0333.

[139] *Id.* at 19.

[140] *See* JX0348 at 1.

[141] JX0333 at 1.

[142] *See, e.g.*, JX0046 at 7.

37

The AEI Rights Agreement, therefore, purported to grant AEI a host of rights neither Clifford nor HS had the right to confer.[143] In exchange, AEI agreed to pay Clifford and HS an initial $1 million advance and a portion of ticket and merchandise sales.[144]

AEI put on a successful exhibit.[145] But the revenue from the Real Pirates exhibit went to HS rather than MEI or the Whydah Joint Venture.[146] Put another way, Defendants put themselves in complete control over the disposition of this income, which should have predominantly been subject to distribution under the Sliding Scale.[147]

After creating HS, Defendants appear to have halted the Whydah Joint Venture's operations. Instead of using MEI and International, Defendants opted to run the entire *Whydah* profit operation through HS.[148] Among other

---

[143] *Compare* JX0003 (Clifford and MUS's assignment of rights to MEI), JX0045 (JVA), *and* JX0046 (OA), *with* JX0333 at 1.

[144] *See* JX0333 at 8–11.

[145] TT240:23–241:10, 242:6–8 (Clifford).

[146] *See* JX0450; JX0788.

[147] *See* JX0045.

[148] *See* JX0450 (asserting that "since its inception in 2006," HS has taken "[a]ll income from the traveling exhibits, the Pirate Museum, and the Marina"); JX0788.

things, these efforts included effectively taking possession of one of MEI's museums in Provincetown, Massachusetts (the "Provincetown Museum").[149]

In 2011, Defendants assigned all HS's rights and obligations under the AEI Rights Agreement to the Whydah Joint Venture.[150] Despite this assignment, Defendants did not direct any income from the Real Pirates exhibit or the Provincetown Museum to the Whydah Joint Venture or through the JVA's Sliding Scale.[151]

In 2012, AEI's parent entity, Premier Exhibits, Inc., filed bankruptcy.[152] This ended the Real Pirates exhibit. From 2012 to 2018, Defendants continued to run all profitable operations—including the Provincetown Museum—out of HS.[153]

### 2. Maritime Heritage Research Labs And Clifford Explorations

After the Real Pirates exhibit closed in 2012, Clifford and HS entered into an assignment and release agreement with AEI that facilitated AEI's

---

[149] *See* JX0788 ("All financial transactions concerning the museum in Provincetown[], the [Real Pirates] traveling exhibit and the marina, and all expenses for the Brewster lab have been conducted under [HS].").

[150] JX1165.

[151] *See* JX0788; JX0450.

[152] Pre-Trial Stip. ¶ 19.

[153] *See* JX0788; JX0450.

39

return of "all exhibits, exhibit objects, artifacts and exhibitry."[154] In addition to the return of the original *Whydah* artifacts, AEI also conveyed two exhibits to HS as part of Premier's liquidation. The exhibits—dubbed "Pirates I" and "Pirates II"—were 10,000 and 20,000-square-foot exhibits, including one scale model of the *Whydah*.[155]

Pirates I and II ended up in two new museums that Defendants opened: one in Salem, Massachusetts and one in Yarmouth, Massachusetts.[156] The Yarmouth Museum opened in 2015. It is not run through HS, MEI, International, or the Whydah Joint Venture. Rather, it is run by another pair of new entities: Clifford Explorations, LLC and Maritime Heritage Research Laboratories, LLC.[157]

Clifford Explorations runs the Yarmouth Museum's business operations.[158] Maritime Heritage Research Laboratories owns the real estate used for the Yarmouth Museum.[159] Clifford paid for the Yarmouth property

---

[154] Pre-Trial Stip. ¶ 19; TT242:10–24 (Clifford).

[155] TT243:5–244:5 (Clifford).

[156] *Id.* at 242:10–244:2 ("So we ended up getting both exhibits back. Pirates I is now in Yarmouth. Pirates II is in Salem.").

[157] *Id.*; *see also* JX0788.

[158] JX0450; JX0449; *see also* JX0840.

[159] *See* JX0445A.

with a combination of cash and borrowed funds secured by a second mortgage on his home.[160]

### 3. 16 MacMillan Wharf Realty Trust

Not to be forgotten, 16 MacMillan Wharf Realty Trust is the final relevant entity. This entity was initially formed in 2008 to purchase the 16 MacMillan Wharf property, which Clifford bought in 1995.[161] Clifford and Lazier renovated the space and used it to open the Provincetown Museum.[162]

Notably, MEI kept many of its corporate records at the 16 MacMillan Wharf property, and in the years leading up to the eventual Merger, significant flooding destroyed a large portion of those records.[163]

Today, the Provincetown Museum is no longer operational, and the first floor of the property is leased to a nonprofit.[164] 16 MacMillan Wharf Realty Trust also owns a marina that was attached to the Provincetown Museum.[165]

---

[160] *See* JX0433; JX1149; TT254:12–255:9 (Clifford).

[161] *See* JX1152.

[162] *See generally* JX0265–JX0267; TT207:19–213:8 (Clifford).

[163] JX0810 ("[W]ith regard to paperwork in general, one thing to keep in mind is that there was a horrible flood in the P'town building a few years back. Margot can give you a better history on that, and she may still have the video she took of it raining indoors. A lot of stuff was ruined in that flood – boxes of paperwork turned to mush and destroyed, so who knows what that included."); TT236:12–18 (Clifford).

[164] TT209:10–212:17 (Clifford).

## I. The 2018 Merger

In 2016, Clifford received an email from his personal attorney.[166] Therein, Tufankjian expressed significant concern over HS.[167] He exclaimed: "I have no idea why you are using Historic Shipwrecks, Inc. for the new business or otherwise!"[168] This admonition was followed by Tufankjian's instructions:

> **Most, most, most important**, I suggest that you somehow get in touch with [corporate counsel] and have him straighten out all of the corporation and stock matters that you are involved with. . . .
>
> Please pay whatever he wants to straighten those companies out as a #1 priority in your life. Otherwise, Barry, you are going to leave a mess to everyone involved. Do not be cheap about this. Pay the guy and get it done. . . . If this person can straighten it out, pay him and have him straighten it out now!!![169]

In January 2017, Defendants engaged attorney Erik Bergman to assess MEI's corporate affairs and facilitate a stock-for-stock merger with International (*i.e.*, the Merger).[170] Bergman recounted the impetus for the

---

[165] *Id.* at 221:10–21.

[166] JX0449.

[167] *See id.*

[168] *Id.* at 1.

[169] *Id.* at 1–2 (bolding and underlining in original).

[170] *See* JX0536.

Merger as inspired by a demonstrated need for "[c]orporate hygiene, to allow the company to set itself up with a cleaner basis for moving forward."[171] As explained below, however, the record also suggests another, more self-serving purpose for the Merger—to deprive MEI's stockholders of the benefits provided under the Sliding Scale.

To lay the groundwork for the Merger, Bergman compiled a list of MEI's stockholders.[172] Relying on Kinkor and Stevens' documents from 2010, Bergman concluded that Clifford "has a majority of the issued and outstanding shares and is the controlling stockholder of MEI."[173]

Defendants' initial goal for the Merger was

[T]o end up with Barry holding 76% of the surviving company (new MEI), Bob Lazier holding 15% of new MEI and other MEI stockholders holding 9% of new MEI, with Bob and Barry having a preference on dividends and distributions by new MEI of $4,000,000.[174]

These percentages and the corresponding exchange ratio used in the Merger were "based off of essentially the revenue split attributable to the

---

[171] Bergman Dep. 14:14–15:7.

[172] JX0577.

[173] JX0573 at 1.

[174] JX0671 at 1; Bergman Dep. 137:4–139:14; *see also* JX0689.

company pre-merger and compensation to Barry and Bob Lazier for services and money that had been put into the company."[175]

This plan would dilute MEI's minority stockholders from their collective holding of roughly 49% of pre-Merger MEI to a holding of less than 10% in post-Merger MEI ("New-MEI"). It would also function to terminate the Whydah Joint Venture and, with it, the Sliding Scale in the JVA.[176] Concerned with how the minority stockholders might react to such a significant loss of control and ownership, Defendants split International's stock "on a 40,860.6 for one basis," so the exchange ratio would be higher (*i.e.*, Defendants would be able to give up more shares of International's stock for the same pre-determined amount of New-MEI's stock).[177] Bergman explained that this stock split "doesn't change anything from a practical perspective, but it does look better to the shareholders of MEI."[178]

But this was not the end. In addition to shifting a significant percentage of ownership, Bergman also structured the Merger to provide

---

[175] *See* Bergman Dep. 137:4–138:6.

[176] *See* JX0045 at 24–25.

[177] *See* JX0671 ("First, Barry will be issued an additional 1,688.3451 shares of common stock of Whydah International, Inc. . . . Immediately after the above stock issuance, the Whydah International, Inc. stock will be split on a 40,860.6 for one basis . . . .").

[178] JX0669.

Defendants with a $4 million liquidation and dividend preference to "compensate[] Barry and Bob" for the "value of services and/or amount of money that [they had] put in it."[179] Bergman suggests Clifford, Lazier, or an MEI "business consultant"[180] (David Wroe) proposed this $4 million figure.[181]

After several iterations, Bergman finalized the Merger instrument (the "Merger Agreement") and an information statement (the "Information Statement").[182] The Board (*i.e.*, Clifford and Lazier) approved the Merger by written consent.[183] Defendants, as MEI's majority stockholders, followed suit and approved the Merger by written consent on June 26, 2018.[184] On June 28, 2018, Defendants sent copies of the Information Statement to all stockholders of record to inform them of the Merger.[185]

---

[179] Bergman Dep. 138:14–139:5; s*ee also* JX0671; JX0698; Bergman Dep. 144:4–20 (discussing the $4 million preference as explained in JX0689 and describing New-MEI's common stock and the preferred stock issued to Defendants as being "the same except that each share of Series A Preferred Stock will be entitled to a preference of $1.73 per share in the event of a sale or other disposition of MEI").

[180] JX0620.

[181] Bergman Dep. 139:6–14.

[182] JX0680; JX0689.

[183] Bergman Dep. 148:10–20.

[184] JX0690.

[185] JX0698.

Of note, Defendants were the only ones negotiating the Merger on MEI's behalf—against themselves.[186] And before approving the Merger Agreement, Defendants never once met formally as the MEI Board "to discuss the merits of the Merger from MEI's perspective."[187] Defendants also rejected Bergman's advice to bring in a valuation expert to conduct an independent appraisal or valuation of MEI.[188] Indeed, Defendants did not bring in *any* financial advisor.[189] Moreover, the Merger was not approved by any independent directors or a special committee.[190] And it was not conditioned on an independent vote by the disinterested minority stockholders.[191] Instead, the minority stockholders only first heard about the Merger through the Information Statement.[192]

After a books and records demand, this litigation followed.

---

[186] Bergman Dep. 148:21–24.

[187] TT554:14–557:18 (Clifford).

[188] *Id.*

[189] *See* Bergman Dep. 149:1–10.

[190] TT554:14–557:18 (Clifford).

[191] *Id.*

[192] *Id.*

## J.  Valuations

The Merger and this litigation spawned natural valuation questions. Over the years, MEI and the *Whydah* artifacts were valued on several occasions.  As I noted above, in 1992, Sotheby's concluded, amidst a flurry of issues surrounding the *Whydah's* tumultuous history and a nationwide recession, that the salvaged *Whydah* artifacts had an estimated auction value of between $220,000 and $350,000.[193]

In May 2011, a potential buyer of the *Whydah* artifacts commissioned a valuation by Durkin Valuation Consultants.[194]  The Durkin report estimated the salvaged treasure and artifacts to be worth $2.5 million.  Durkin based this estimate, in significant part, on its review of "a large randomly preselected sampling of . . . coins stored in a safe deposit box."[195]

Two months later, in July 2011, Defendants sought another valuation by Daniel Sedwick,[196] whom they described as a "world[-]renowned expert" in

---

[193] JX0207.

[194] JX0351.

[195] *Id.* at 9.  The Durkin report further "assumed . . . that the sampling was a fair representation of the condition, weight, clarity, and denominations of the coins on Cape Cod."  *Id.*

[196] JX0355.

colonial-era coinage.[197]  And indeed, Sedwick had "done several appraisals for the State of Florida for similar items from the 1715 Fleet, and . . . . [Sedwick had] nearly 30 years' experience in dealing with this type of coin."[198]  Outside of the *Whydah* valuations, Sedwick estimates that he has "probably appraised and sold over 150,000 coins."[199]

In 2011, Sedwick concluded that the salvaged *Whydah* coin collection, which he understood to consist of "roughly 8500 coins"[200] at the time, was worth $8.6 million "as a museum display for which admission can be charged and rent can be collected."[201]  Sedwick based this valuation on a formula that started with base values correlating to those used for coins from other, non-pirate shipwrecks.  Then, Sedwick applied a series of multiples to those values to reach each coin's promotional value (*i.e.*, "the values of the coins . . . to museum-venture investors").[202]

---

[197] JX0488.

[198] JX0715.

[199] *Id.*

[200] JX0701; *see also* JX0355 ("fewer than 10,000 coins").

[201] JX0355.

[202] *See id.*

Sedwick appraised the salvaged coins a second time in July 2018, less than a month after the Merger and before Plaintiff sent his books and records demand.[203] Therein, he began by recognizing the unique nature of the coin collection as being the "only known pirate treasure," which, he noted, "adds to the interest and value exponentially."[204] He proceeded with his analysis by recounting that since October 2011, seven of the *Whydah* coins had been sold at auction, with sale prices ranging from $6,168.75 to $16,450 for each coin.[205] Those sales placed the mean sale price at roughly $10,000 per coin.[206] Based on this estimate and his understanding that the coin collection now consisted of 15,000 coins, Sedwick valued the salvaged coins alone at $150 million.[207] He valued the rest of the artifacts at $50 million, pushing his total valuation of all recovered *Whydah* artifacts and treasure to $200 million.[208] At the time, Clifford believed this valuation was a "fair appraisal."[209]

---

[203] JX0715.

[204] *Id.*

[205] *Id.*

[206] *Id.*

[207] *Id.*

[208] This appears to fall within the ballpark of other, seemingly more speculative, valuations. *See, e.g.*, JX0387 ("An estimate by *Forbes* magazine (9/19/2009) of the modern worth of the gold and silver carried by the *Whydah* was $120 million, *excluding considerations of antiquity, rarity and*

49

At trial, I heard testimony from two experts. Plaintiff's expert, Joseph Thompson, testified that MEI's total value at the time of the Merger was $76.3 million. Thompson's valuation picks up where Sedwick's 2018 report left off, using $200 million "as the starting point for the hypothetical liquidation value" of the salvaged *Whydah* treasure and artifacts.[210] Then, in valuing the coins, Thompson applied a "blockage discount" rate of 30% to their $150 million appraised value to account for the economically depressing effect that may accompany selling "such a large block of an asset."[211] He then applied an estimated 5% broker fee and 27.3% tax rate.[212] From this, he concluded each coin should be valued at $4,800 and, together, at the time of the Merger, all the coins were worth $72.5 million. Applying a similar process for the other *Whydah* assets, Thompson estimated those assets were worth $2.4 million.[213] Although Thompson did not assess International's

---

*numismatic value,* while the former director of the MA Board of Underwater Resources provided an estimate of $400 million (*The New York Times* 1/8/85).").

[209] JX0710 ("200 million, including coins, exhibits, real estate and hundreds of thousands of artifacts is [a] very fair appraisal.").

[210] JX1014 at 6.

[211] TT636:10–15 (Thompson); JX1014 at 6.

[212] JX1014 at 6.

value outright, his report assumed its only asset was "the piece of property at 486 Underpass Road" in Brewster, Massachusetts ("Brewster Lab").[214]

In stark contrast to Thompson's valuation and Sedwick's appraisals, Defendants' expert, Dr. Brett Margolin, testified that, together, all the recovered *Whydah* treasure and artifacts were worth $1.08 million at the time of the Merger.[215] Dr. Margolin started by using "the transcript of the settlement hearing, Mr. Betts'[s] deposition," and Bergman's deposition.[216] And he based his assessment in primary part on the 1992 Sotheby's opinion and the 2011 Durkin report to value the coins. Specifically, he asserted that the increase in value of the coins from the 1992 Sotheby's opinion to the 2011 Durkin valuation "correlates closely to the volatility in silver prices" during that time.[217] Applying the subsequent decline in silver from 2011 to the

---

[213] Together with his valuation of the coins and MEI's going concern value, Thompson arrived at a $76.3 million valuation. Thompson conducted a second analysis, which he described as "Scenario 2." But he ultimately "gave . . . no weight to Scenario 2," and I will therefore not consider it here. TT647:9–10 (Thompson).

[214] JX1014 at 51–53.

[215] JX1015 at 22; TT772:24 (Margolin).

[216] TT754:9–13 (Margolin).

[217] JX1015 at 21.

51

valuation date, he arrived at a $1.08 million valuation for the coins and artifacts.[218]

Dr. Margolin then valued MEI and International based on their claims to Whydah Joint Venture assets and cashflows under the JVA's Sliding Scale. Unlike Thompson, Dr. Margolin included "JV capital account true-ups" in his valuation of Whydah International, which were "capital contributions . . . made by Clifford and Lazier from . . . 2011 forward."[219] Using, among other things, his estimate for capital account true-ups and his estimated value of the Brewster Lab property, Dr. Margolin suggests that International, for its part, brought roughly $1.33 million to the table..[220]

Two other considerations bear noting. First, neither expert includes any assessment of the remaining *Whydah* wreckage in their valuations of MEI and International. Defendants' internal documents, however, show they believed "only 15% of the treasure has been extracted based on a most conservative estimate."[221] Clifford confirmed this assessment at trial.[222]

---

[218] *Id.* at 22.

[219] TT757:24–758:3 (Margolin).

[220] JX1015 at 44.

[221] JX0537 at 3; *see also* JX0387 ("Based on primary source evidence, it is believed that 75–85% of the treasure carried by the *Whydah* remains to be excavated."); JX0351 at 7 ("Clifford has estimated that the recovery represents approximately 10% to 15% of the treasure in the wreck site.").

Defendants believed the unrecovered treasure may be worth "hundreds of millions of $[.]"[223] And based on his extensive experience assessing and valuing coins from shipwrecks in the same era, Sedwick noted that he "would expect the [total] amount of treasure on board the Whydah to be far more than the 15,000 coins already recovered . . . by at least one and possibly even two orders of magnitude (*i.e.*, 150,000 to 1,500,000 coins)."[224] He also explained that he "would expect way more gold than currently inventoried in the recoveries, and [his] experience is that gold, being the denser metal, is usually found at the bottom of a given wreck site, particularly the heavy ingots."[225] Accordingly, Sedwick concluded "that the 'mother lode' of the wreck has not yet been found."[226] Although he did not assign a value to this unrecovered treasure in his final 2018 valuation, he explained in earlier

---

[222] TT527:20–22 (Clifford) ("Q. Do you believe that 15 percent has been extracted, and 85 percent is still out there? A. Yes.").

[223] JX0537.

[224] JX0715 (italics added). This seems to comport with Clifford's understanding of the treasure that was on board the *Whydah* when it sank. In a December 2017 email, he suggested that the last two ships the *Whydah*'s crew had robbed before the *Whydah* sank (out of a total of 53 ships) held a believed "400,000 coins . . . this does not include the 4.5 tons of treasure taken from the Whydah, or 50 other vessels they robbed. This can all be documented w [*sic*] primary source docs." JX0620 (ellipsis in original).

[225] JX0715.

[226] *Id.*

drafts of the report that "the value of the rest of the *Whydah* material still to be recovered could exceed $1 billion."[227]

Relatedly, Clifford's testimony at trial was consistent with the notion that Defendants believed they were on the brink of uncovering "the mother lode."[228]  Clifford testified that over the past 40 years, he had conducted over 400 dives on the *Whydah*.  After discussing those dives at trial, Clifford had a peculiar interaction with counsel in which he appeared to stop himself mid-sentence from saying he believed they have found, or are finally close to finding, the mother lode.

> "Q. Okay.  You've been out there for 40 years now, have you found the mother lode?
>
> A. I'm not going to say -- yeah, I think we -- no, we haven't found the mother lode yet. . . .  [B]ut we had a very interesting pull."[229]

This testimony relates, in part, to the treasure that was rumored to be aboard the *Whydah* when it sank.  According to Clifford, after the *Whydah* sank, one of the surviving members of its crew testified shortly before his

---

[227] JX0701; JX0706.

[228] TT137:3–11, 143:3–144:12 (Clifford).

[229] *Id.* at 137:6–11.

execution that they kept their treasure chests between the ship's decks.[230] The crew kept the cannons on the lower deck, close to the ship's keel and beneath the treasure chests—at least when the *Whydah* sat upright. But, when the *Whydah* sank, from what Defendants could tell, it "turned upside down," so the cannons settled on top of where they now believe the mother lode to be.[231]

Clifford then explained that in their more recent excavations, after digging thirty feet down, they uncovered "seven cannons and two giant rolls of lead fused into one big concretion . . . . [And along] the whole bottom, there's coins stuck to it, gold dust and artifacts. So [they] think that's a good spot where more of the treasure could be."[232] In an email to Sedwick shortly after the Merger, Clifford confirmed his interpretation of these events. He sent a photo of a bag with "500 bracelets w/hundreds [*sic*] more to be excavated" and concluded, "I think we're getting close to the mother Lode [*sic*] . . . all kinds of artifacts we've never seen before . . . crazy[]!"[233]

---

[230] TT143:3–144:12 (Clifford); *see also* JX1034 ("Evidence today points to the bulk of the treasure concentrated beneath a cannon pile as decks collapsed exactly as Southack indicated in his final report to the Governor.").

[231] *See* TT143:3–144:12 (Clifford).

[232] *See id.*

[233] JX0902 (ellipses in original).

In conjunction with Clifford's testimony, other evidence in the trial record appears consistent with the notion that Defendants believed they were on the cusp of uncovering significant treasure shortly before the Merger.[234] Indeed, in January 2017, the same month Defendants engaged Bergman to advise on the Merger, MEI's 2017 investor presentation stated the following: "There is a pressing need for MEI to accelerate the exploration of the Whydah site with indications of a concentration of treasure."[235]

Similarly, Wroe sent Clifford a single slide in the body of an email in February 2017 for Clifford's review. The slide stated that "[l]ess than 15% of the treasure has been extracted and we are accelerating the exploration of the Whydah site which has shown a promising concentration of coins."[236] And in the process of bringing Bergman aboard, Clifford forwarded him a December 31, 2016, email from Wroe, which included a copy of Wroe's investor presentation as an attachment. In Wroe's email, he included a list of recent changes he made to the presentation. The only bolded text in Wroe's email to Clifford provided the following change: "**Accelerating priority and**

---

[234] *See, e.g.*, JX1034 at 20; JX0537; JX0548.

[235] JX0537 at 38.

[236] JX0548.

**funding for Whydah Site exploration right away this year with a new Xray slide with coins added**[.]"[237]

Second, Dr. Margolin's opinion relies heavily on the survival of the JVA. This assumes, however, there was some valid amendment to the JVA that extended its termination date past December 31, 2017.[238] Defendants point to three purported amendments they argue extended the Whydah Joint Venture so that it was effective at the time of the Merger. The first purported amendment "extended" the JVA to December 31, 2016.[239] This would have reduced the JVA's term by one year. The second purported amendment occurred during a supposed "Whydah Joint Venture board

---

[237] JX0513 (bolding in original). Separately, I note that Clifford is waiting to sign the contract for an apparently lucrative Las Vegas deal that has been in play since relatively soon after the Merger. *See* JX0959; JX0953. Clifford suggested the new exhibit would likely attract "300,000+ visitors at approximately $30 per visitor + merchandise." JX0959. At trial, Clifford testified he could "sign [the Las Vegas deal] contract today." TT285:10–21 (Clifford). Yet, notwithstanding Clifford's belief the deal could bring in "big numbers," his testimony and demeanor made clear that he is content first to wait and see how this litigation concludes. *See, e.g.*, *id.* at 285:10–21, 317:2–21. Having heard and seen Clifford's testimony on this point and others, I would not be surprised if Clifford is also waiting for the conclusion of this litigation before proceeding with further significant excavation of the *Whydah* site, particularly if such excavation would publicly confirm Clifford's belief that he is on the cusp of discovering significant treasure.

[238] *See* JX0045 at 19.

[239] JX0359 at 1.

meeting"[240] on February 21, 2018—two months after the end of the JVA's original term.[241] The only documentary evidence of this second extension is an email from Clifford, in which he asserts they extended the Whydah Joint Venture "through 2025," though they do not provide a specific termination date.[242] The final purported extension took place in March 2016.[243] Defendants, acting in their capacity as directors of both MEI and International, signed an extension through December 31, 2022.[244] But MFC did not sign this extension, as required for amendments to the JVA.[245]

---

[240] This presumably refers to a meeting by the Management Committee.

[241] JX0631.

[242] *Id.* at 1.

[243] JX0273 at 1. This seems to be the only potentially viable extension. But, as Clifford explained in a February 2017 email to Bergman, "[t]he Joint Venture Agreement . . . provides that the joint venture continues until December 31, 2017[,] unless terminated earlier. As far as I know, it has not been terminated." JX0543. Had Defendants extended the JVA in March 2016, as they now vigorously argue, it is unclear why Clifford would not have included mention of it.

[244] JX0273 at 12.

[245] *See* JX0045.

## K. Procedural History

On January 9, 2019, Buddenhagen made a books and record demand pursuant to Delaware General Corporation Law ("DGCL") Section 220.[246] On April 4, 2019, Buddenhagen commenced this action.[247] On April 18, 2020, Lazier passed away, after which the Court granted Plaintiff's motion to substitute the Estate of Robert T. Lazier as a party.[248]

In May 2021, the parties reached a settlement in which Plaintiff agreed to release all claims against Defendants. In exchange, Defendants had agreed to convert their 2,424,293 shares of preferred stock in New-MEI to 85,303 shares of New-MEI's common stock.[249] This would have left Defendants with a slight majority of New-MEI's stock while significantly reducing the dilutive effect of the Merger on the minority stockholders.[250] In unconventional fashion, however, Buddenhagen wrote a letter to the Court shortly before the settlement hearing took place. Therein, he raised a host of objections and deficiencies with the proposed settlement and proposed a

---

[246] Dkt. 80 ¶ 58; JX0769.

[247] Dkt. 1.

[248] *See* Dkt. 45; Dkt. 49.

[249] JX1145 at 48.

[250] *Id.*

variety of his own modifications to it.[251]  Vice Chancellor Laster ultimately

rejected the settlement.[252]  In doing so, he took note of the serious claims

Plaintiff asserted and the relatively limited amount of discovery up to that

point.[253]  Subsequently, Plaintiff filed the First Amended Verified

Stockholder Class Action and Derivative Complaint in October 2021.[254]  After

Defendants filed a motion to dismiss, Plaintiff filed the Second Amended

Verified Stockholder Class Action and Derivative Complaint (the "SAC") on

January 20, 2022.[255]  The case was reassigned to me on August 10, 2022.[256]

Trial took place from February 6 to 8, 2023, and I heard post-trial oral

argument on October 2, 2023.  Defendants' counsel provided a supplemental

letter on October 24, 2023.

## II.    LEGAL ANALYSIS

The present action centers around two issues.  The first deals with

whether Defendants breached their fiduciary duties by engaging in the

---

[251] Dkt. 61.

[252] Dkt. 51; Dkt. 65.

[253] JX1146 at 36.

[254] Dkt. 72.

[255] Dkt. 80.

[256] Dkt. 140.

Buyout, the events involving HS and AEI, and Defendants' other non-Merger acts. The second asks whether the Merger was both validly approved and entirely fair.

To the former, Plaintiff argues that over the past 30 years Defendants have breached their duty of loyalty to MEI by, among other things, usurping MEI's corporate opportunities, diverting and converting corporate funds and assets, and engaging in rampant self-dealing. In response, Defendants advance a laches defense, which, they argue, bars Plaintiff "from challenging the hornets' nest of decades[-]old occurrences in connection with this litigation."[257]

No one can deny that Defendants faced tremendous prejudice from Plaintiff's delay in bringing this action. Textbook examples of laches prejudice—including the destruction of records through floods and the death of multiple key witnesses—make it very clear that, if evidence existed that could prove Defendants' conduct over the prior decades was proper, Defendants have been severely prejudiced in their ability to produce it. It is also clear that Plaintiff was on inquiry notice of the alleged breaches many years before initiating this action. Accordingly, principles of equity, which

---

[257] Def's Post-Trial OB at 52.

manifest themselves through the doctrine of laches, compel me to conclude that Plaintiff is time-barred from asserting its non-Merger claims.

As to the second issue, Plaintiff argues a majority of MEI's common stock did not approve the Merger because Defendants did not hold the requisite percentage of MEI stock. Next, Plaintiff attacks the Merger's fairness. Defendants raise three responses to fairness. First, Dr. Margolin's assessment suggests the transaction was fair; second, they relied on Bergman's belief the Merger consideration was fair; and third, they subjectively believed the Merger consideration was fair. As I explain below, none of Defendants' arguments as to fairness prevail.

## A. Laches: A Slumbering Stockholder

Plaintiff develops three non-Merger claims in his post-trial briefing. First, he asserts Defendants usurped MEI's corporate opportunity by using International to buy WPLP's Whydah Joint Venture interest. Next, he argues Defendants put their own interests above MEI's by usurping MEI's corporate opportunity and diverting corporate funds to themselves through the events involving the AEI Rights Agreement and the Real Pirates exhibit. Third, Plaintiff argues Defendants converted the Provincetown Museum's assets and operations by moving them under HS and directing revenues to

62

HS's accounts.[258] As a fourth potential argument, raised only in his pre-trial briefing and at oral argument, Plaintiff challenged the fairness of any stock issuances Defendants may have granted themselves.

As noted, Defendants assert the defense of laches. "[L]aches provides the proper framework for analyzing timeliness" of "equitable claim[s] for breach of fiduciary duty."[259] "When asserting a timeliness defense, a defendant argues that even if the claims are viable, the plaintiff cannot assert them, so the court effectively assumes the validity of the claims, then applies timeliness principles."[260] Accordingly, my review of Plaintiff's non-Merger claims begins and ends with laches.

Plaintiff makes brazen allegations of Defendants' rampant breaches of the fiduciary duty of loyalty and plundering of corporate assets and opportunities. Ordinarily, Plaintiff's claims would invoke the burden-shifting

---

[258] Plaintiff also launches a barrage of stray assertions related to various transactions. None of these claims are developed in any meaningful form, and most are comprised entirely of conclusory assertions of misconduct. Although I do not consider these issues expressly herein, I note that even if I overlooked Plaintiff's pleading and notice failures—which those miscellaneous assertions would not survive—they would fall subject to this same laches analysis, and Plaintiff would not prevail.

[259] *Ontario Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, 294 A.3d 65, 84 (Del. Ch. 2023).

[260] *Lebanon Cnty. Emps.' Ret. Fund v. Collis*, 287 A.3d 1160, 1193 (Del. Ch. 2022).

63

component of an entire fairness review. But Plaintiff sat on his claims for over two decades. And it is well recognized "that equity aids the vigilant, not those who slumber on their rights."[261] This "is the very definition of laches, slumbering on one's rights."[262]

Expounding on the laches doctrine's equitable underpinnings, an English Chancellor explained:

> A court of equity which is never active in relief against conscience or public convenience, has always refused its aid to stale demands, where the party has slept upon his rights, and acquiesced for a great length of time. Nothing can call forth this Court into activity but conscience, good faith, and reasonable diligence.[263]

This equitable underpinning is embodied in two elements. To succeed in barring a claim on laches grounds, a defendant must demonstrate "(i) unreasonable delay in bringing a claim by a plaintiff with knowledge thereof, and (ii) resulting prejudice to the defendant."[264]

---

[261] *Whittington v. Dragon Grp., L.L.C.*, 991 A.2d 1, 8 (Del. 2009).

[262] *Jacam Chem. Co. 2013, LLC v. Jacam Chem. Co. Inc.*, 2024 WL 960180 (Del. Ch. Mar. 1, 2024).

[263] *Blakeley v. Scanlon*, 604 A.2d 416 (Del. 1991) (quoting *Smith v. Clay*, 3 Brow Ch. 638 per Lord Camden) (TABLE); *accord Fontana v. Julian*, 1980 WL 267618, at *2 (Del. Ch. Jan. 2, 1980); 2 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 419, at 171 (5th ed. 1941).

[264] *Collis*, 287 A.3d at 1194 (quoting *Levey v. Brownstone Asset Mgmt., L.P.*, 76 A.3d 764, 769 (Del. 2013)).

### 1. Unreasonable Delay

For the first element of laches, I must determine if Plaintiff delayed unreasonably in bringing his claims. I discuss this inquiry in three parts: the limitations period, the accrual method, and tolling.

### a. Limitations Period

"Unless the plaintiff asserts a legal claim seeking legal relief, the Court of Chancery generally applies the equitable doctrine of laches in determining whether the plaintiff has timely brought her claims."[265] And, "[w]hen applying . . . laches, the Court of Chancery 'afford[s] significant weight to an analogous statute of limitations when one exists and will presumptively bar an action filed after the limitations period, absent tolling or unusual circumstances that would make it inequitable to do so.'"[266]

Here, Plaintiff asserts claims for breach of the duty of loyalty. Such "claim[s] sound[] in equity, so the doctrine of laches applies."[267] Plaintiff also seeks money damages and the cancellation of stock issued in the Merger.[268]

---

[265] *Jacam Chem. Co. Inc.*, 2024 WL 960180, at *7.

[266] *Id.*

[267] *Collis*, 287 A.3d at 1194.

[268] *See* SAC ¶¶ 85–100; Pl's Pre-Trial Br. at 63–64.

So, the limitations period for a comparable claim at law applies with presumptive force.[269]

"[T]o identify the statutory period for a comparable claim" of breach of fiduciary duty, Delaware courts "regularly look[] to Section 8106 of Title 10 and its three-year limitations period."[270] Defendants correctly argue, and Plaintiff does not dispute, that this three-year limitations period applies to Plaintiff's claims.

### b. Accrual Methods

"In addressing when an action is time-barred, a necessary first step in the analysis is determining the time when the action accrued."[271] "Delaware decisions use three methods to determine when a claim accrues: the discrete act method, the continuing wrong method, and the separate accrual

---

[269] *Collis*, 287 A.3d at 1195 ("Because the plaintiffs seek money damages, the court looks to the limitations period that would govern a comparable claim at law. 'A filing after the expiration of the analogous limitations period is presumptively an unreasonable delay for purposes of laches.'") (citation omitted).

[270] *Id.*

[271] *U.S. Cellular Inv. Co. of Allentown v. Bell Atl. Mobile Sys., Inc.*, 677 A.2d 497, 503 (Del. 1996); *Collis*, 287 A.3d at 1178 ("To determine when the analogous limitations period would end, the court must determine when a claim accrues.").

method."[272]  The first two methods are relevant here.  No party has argued the separate accrual method applies to any of Plaintiff's claims.

"The discrete act method applies in the vast majority of cases."[273]  It "applies when a claim arises at a distinct point in time and is effectively complete as of that date, even if it has ongoing effects or implications."[274]  From the accrual date, a court "counts forward to determine when the limitations period would end, and checks whether the plaintiff filed suit within the limitations period."[275]  Although "[t]olling doctrines can extend the time for filing suit," for discrete acts, tolling stops "once a plaintiff is on inquiry notice."[276]

In contrast to the discrete act method, the continuing wrong method "applies when the conduct giving rise to the claim persists over time."[277]  To show a continuing wrong, "the plaintiff" must demonstrate "that the various

---

[272] *W. Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, 2024 WL 550750, at *4 (Del. Ch. Feb. 12, 2024).

[273] *Collis*, 287 A.3d at 1178.

[274] *Moelis*, 2024 WL 550750, at *4.

[275] *Collis*, 287 A.3d at 1178.

[276] *Id.*

[277] *Moelis*, 2024 WL 550750, at *4.

acts are 'so inexorably intertwined that there is but one continuing wrong.'"[278]

Here, Defendants argue the acts Plaintiff challenges are discrete acts. Plaintiff asserts the acts are a part of a continuing wrong. But Plaintiff makes little effort to develop this argument.

I conclude that all Plaintiff's claims arising from the Buyout, AEI Rights Agreement, conversion of the Provincetown Museum operations and assets, and potential self-dealing associated with the stock issuances accrued under the discrete act method.

"[W]hen a fiduciary makes an affirmative decision, such as when a board approves a contract or grants an option[,]" the "wrongful act takes place when the decision is made, and any cause of action for breach of fiduciary duty accrues at that point."[279]

> As Chancellor Allen explained in a case where a plaintiff challenged a decision by an interested board majority to cause the corporation to enter into a contract with its controlling stockholder, ["a]ny such wrong occurred at the time that enforceable legal rights against Seaboard were created. Suit could have been brought immediately thereafter to rescind the contract and for nominal damages which are traditionally available in contract actions. Complete and adequate relief, if

---

[278] *Collis*, 287 A.3d at 1197 (quoting *Ewing v. Beck*, 520 A.2d 653, 662 (Del. 1987)).

[279] *Id.* at 1196.

68

justified, could be shaped immediately or at any point thereafter.["][280]

Likewise, here, the causes of action attributable to Defendants' acts accrued at the time of the wrongdoing as discrete acts. At each juncture, Defendants took specific, affirmative acts that immediately gave rise to a cause of action and associated liability, even if nominal in nature. Plaintiff's claim arising from the Buyout arose in December 1995 when Defendants caused International to enter the Buyout Agreement. Defendants' asserted acts to usurp MEI's opportunity by entering and causing HS to enter the AEI Rights Agreement accrued at the time of contracting in December 2006. Plaintiff's claim arising from Defendants' alleged conversion of the Provincetown Museum also accrued in 2006 when Defendants moved the operations and diverted its cashflows to HS. The same goes for the stock Defendants issued themselves, which, as I explain below, occurred sometime between 2004 and 2009. Any causes of action arising from these acts accrued at the time Defendants undertook the alleged wrongs.

At each of these points, Plaintiff could have sued immediately after the act occurred, and, if justified, appropriate relief could have been fashioned at

---

[280] *Id.* (quoting *Kahn v. Seaboard Corp.*, 625 A.2d 269, 271 (Del. Ch. 1993)).

that time. For purposes of this analysis, it is of little consequence that damage may have resulted some years after the act occurred.[281]

Thus—absent tolling—for each of Plaintiff's claims, the applicable three-year limitations period began to run at the point of the alleged wrongdoing. Counting three years forward, a claim challenging the Buyout in 1995 would be presumptively barred by laches if brought after December 1998. The same would be true for a challenge to the AEI Rights Agreement[282] and any claim for conversion of the Provincetown Museum's operations and assets if brought after December 2009. Even if I consider Plaintiff's fairness challenge to the stock issuances, it would, like the other

---

[281] *Moelis*, 2024 WL 550750, at *4 (The discrete act method "applies when a claim arises at a distinct point in time and is effectively complete as of that date, *even if it has ongoing effects or implications*.") (emphasis added); *Collis*, 287 A.3d at 1196 ("It is not required that all the damages resulting from the act shall have been sustained at that time, and the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date.").

[282] As an aside, Plaintiff may have been able to argue that the AEI Rights Agreement and its three amendments should be considered under the separate accrual method, with each amendment "be[ing] regarded as a separate cause of action, for which suit must be brought within the period beginning with its occurrence." *Collis*, 287 A.3d at 1199 (discussing examples of the separate accrual method). Nonetheless, Plaintiff does not raise this argument. And, even if Plaintiff had raised it, the timing of the accrual period would not likely save him since none of the amendments took place within the three years that preceded Plaintiff's Section 220 demand or action in 2019.

claims, be presumptively barred if brought after January 2012 (assuming Defendants did not issue themselves any shares until 2009).

Plaintiff does not develop his argument that the challenged acts are a part of a continuing wrong. His argument consists of four conclusory statements in a single paragraph. But to show a continuing wrong, "the plaintiff" must demonstrate "that the various acts are 'so inexorably intertwined that there is but one continuing wrong.'"[283]

Plaintiff does not meet this burden. And it would be a tall order indeed, given the opportunistic nature of the alleged misconduct and the temporal distance between the challenged acts. Drawing any cohesive narrative is difficult, much less one that shows the acts to be "inexorably intertwined." Here, Plaintiff has not shown that the challenged acts rose to this level, such that I should consider them as one continuing wrong. Accordingly, I reject Plaintiff's argument and conclude the causes of action for each of the non-Merger claims accrued under the discrete acts method.

### c. Tolling

The requirement of knowledge is foundational to a laches defense. In many articulations of laches, "knowledge" is displayed prominently as the

---

[283] *Id.* at 1197 (quoting *Beck*, 520 A.2d at 662).

first element.[284]   This follows because it is what turns *delay* into *unreasonable delay*.   Moreover, it drives to the very core of the laches doctrine—informing the extent of a stockholder's vigilance or lack thereof. "The equitable defense of laches is based on the theory that upon a person's acquiring knowledge of a wrong affecting his rights, any unreasonable delay in asserting an equitable remedy will bar such form of relief."[285]  "[A] person with knowledge . . . should not be permitted to sit by in silence while positions are fundamentally changed by potential adversaries and the rights of third parties accrue."[286]  Accordingly, "a plaintiff is chargeable with such knowledge of a claim as he or she might have obtained upon inquiry, provided the facts already known to that plaintiff were such as to put the duty of inquiry upon a person of ordinary intelligence."[287]

Here, Plaintiff argues "the accrual date runs from when a stockholder was placed on 'inquiry notice.'"[288]  But it is well established that "Delaware is

---

[284] *See, e.g.*, *Reid v. Spazio*, 970 A.2d 176, 182–83 (Del. 2009); *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 210 (Del. 2005); *Fotta v. Morgan*, 2016 WL 775032 (Del. Ch. Feb. 29, 2016).

[285] *Julian*, 1980 WL 267618, at *1.

[286] *Fike v. Ruger*, 752 A.2d 112, 113 (Del. 2000).

[287] *Id.* at 114.

[288] Pl's Post-Trial AB at 80.

an occurrence rule jurisdiction, meaning a cause of action accrues at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action."[289] Inquiry notice would instead go to the issue of tolling.

Plaintiff does not address tolling outright. He only quotes from a section of a case addressing the doctrine of equitable tolling.[290] Nonetheless, I consider the issue for its substance. Here, Buddenhagen's knowledge is particularly strong and informs the unreasonableness of his decades-long slumber.

"[T]he doctrine of equitable tolling stops the statute from running while a plaintiff has reasonably relied upon the competence and good faith of a fiduciary."[291] "Underlying this doctrine is the idea that 'even an attentive and diligent [investor] relying, in complete propriety, upon the good faith of [fiduciaries] may be completely ignorant of transactions that . . . constitute self-interested acts injurious to the [entity].'"[292]

---

[289] *Collis*, 287 A.3d at 1195 (quoting *ISN Software Corp. v. Richards, Layton & Finger, P.A.*, 226 A.3d 727, 732 (Del. 2020)).

[290] *See* Pl's Post-Trial AB at 80.

[291] *Collis*, 287 A.3d at 1217–18.

[292] *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at \*6 (Del. Ch. July 17, 1998) (third alteration added), *aff'd*, 725 A.2d 441 (Del. 1999).

Equitable tolling is designed "to ensure that fiduciaries cannot use their own success at concealing their misconduct as a method of immunizing themselves from accountability for their wrongdoing."[293]  But "[i]nquiry notice universally limits tolling."[294]  Put another way, to invoke the equitable tolling doctrine, "the facts underlying a claim [must be] so hidden that a reasonable plaintiff *could not* timely discover them."[295]  "A plaintiff must sue within a reasonable time after the plaintiff 'was objectively aware, or should have been aware, of facts giving rise to the wrong.'"[296]  Indeed, "[e]ven where a defendant uses every fraudulent device at its disposal to mislead a victim or obfuscate the truth, no sanctuary from the statute will be offered to the dilatory plaintiff who was not or should not have been fooled."[297]

> Inquiry notice does not require a plaintiff to have actual knowledge of a wrong, but simply an objective awareness of the facts giving rise to the wrong—that is, a plaintiff is put on

---

[293] *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 813 (Del. Ch. 2009) (citing *Seaboard Corp.*, 625 A.2d at 269), *aff'd sub nom. Tchrs.' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011).

[294] *Walton*, 294 A.3d at 96.

[295] *Jacam Chem. Co. Inc.*, 2024 WL 960180, at *8 (alteration in original) (emphasis added).

[296] *Walton*, 294 A.3d at 96.

[297] *Id.*

inquiry notice when he gains possession of facts sufficient to make him suspicious, or that ought to make him suspicious.[298]

Before turning to the question of inquiry notice, however, I must determine whether the equitable tolling doctrine applies. Plaintiff bears this burden.[299]

Here, Buddenhagen has extensive business experience. He earned both his bachelor's degree in economics and his master's degree in business administration from Harvard University.[300] Thereafter, he joined a management consulting firm where he worked for many years before serving as a member of Lydall Inc.'s board of directors.[301] At the time, Buddenhagen testified that Lydall was publicly traded on the New York Stock Exchange and valued at "about 600 million."[302]

Defendants brought Buddenhagen to MEI as a consultant because of his business acumen. As a consultant, Buddenhagen helped lead Defendants'

---

[298] *Id.*; *see also Ruger*, 752 A.2d at 114; *Burkhart v. Genworth Fin., Inc.*, 250 A.3d 842, 861 n.135 (Del. Ch. 2020) ("Inquiry notice does *not* require *actual* discovery.") (quoting *In re Dean Witter*, 1998 WL 442456, at *7).

[299] *Bell Atl. Mobile Sys., Inc.*, 677 A.2d at 497 ("[The plaintiff] has the burden to prove that the running of the limitations period should have been tolled[.]").

[300] TT6:1–19 (Buddenhagen).

[301] *Id.* at 7:1–9:22.

[302] *Id.*

charge in negotiating better terms under the JVA with WPLP.[303]  Defendants also placed Buddenhagen on the Whydah Joint Venture's Management Committee as one of MFC's designees under the JVA.[304]

Buddenhagen testified about significant concerns that arose during his tenure at MEI.[305]  This included concern that "most of the information was centralized in Mr. Clifford," such that Buddenhagen felt he "was only getting part of the information about what was really going on."[306]  Buddenhagen also recounted his concern with Clifford's "insistence that," certain funds "would come to him personally, *which suggested to me that he had a view of what was coming to him that may have not been consistent with increasing the value of MEI*."[307]

Buddenhagen was involved in MEI's day-to-day business and attended Board meetings through which he became generally apprised of MEI's operations.[308]  He was also aware of the unconventional methods Defendants

[303] JX0170 at 3; TT12:11–16:3, 32:16–21 (Buddenhagen).

[304] *See* JX0188 at 1; TT63:11–24 (Buddenhagen).

[305] *See* TT77:18 (Buddenhagen).

[306] Buddenhagen Dep. 75:1–11.

[307] *Id.* (emphasis added); *see also* TT111:20–112:16 (Buddenhagen).

[308] *See* JX0186; TT63:11–20 (Buddenhagen).

used to address various corporate issues—especially MEI's poor economic state. Buddenhagen even participated in these unconventional practices and went so far as to personally pay certain debts on MEI's behalf.[309] MEI compensated Buddenhagen with stock—as it did for many of those involved in its business operations.[310] In 1994, Buddenhagen became aware that WPLP planned to sell its Whydah Joint Venture interest.[311] Buddenhagen even discussed buyout offers with John Begg.[312] And, following the non-renewal of his consultation agreement with MEI, Buddenhagen retained MEI records until April 1996.[313]

Plaintiff's testimony suggests he did not believe Defendants to be competent or unconflicted fiduciaries who were willing to execute their fiduciary duties in good faith. Given his background knowledge of, and involvement in, MEI's operations and business methods and the concerns Buddenhagen expressed—specifically questioning Clifford's willingness to pursue MEI's interests—Buddenhagen's reliance (if any) on Defendants as

---

[309] Buddenhagen Dep. 66:8–22; TT58:5–11 (Buddenhagen).

[310] *See* JX0193 at 2.

[311] *See* JX0235; Buddenhagen Dep. 67:1–68:15.

[312] *See* JX0235; Buddenhagen Dep. 67:1–68:15.

[313] *See* JX0778.

competent fiduciaries capable of exercising their roles in good faith was unreasonable. And since it was unreasonable for Buddenhagen to rely on Defendants' "competence and good faith," Plaintiff has not shown it is appropriate, all things considered, to apply the doctrine of equitable tolling to the present facts.

As I explain below, this became even clearer as time progressed. Accordingly, I conclude here that Plaintiff failed to show that the equitable tolling doctrine should apply.[314] Frankly, I could end my analysis of unreasonable delay here. But even if I assume the equitable tolling doctrine applies, Plaintiff was on inquiry notice or had actual knowledge sufficient to end tolling.

"[T]he question of inquiry notice is factually[ ]intensive . . . and case-specific."[315] Moreover, actual knowledge also ends equitable tolling and requires suit to be brought within a reasonable time therefrom.[316] Here, Defendants showed that Plaintiff had direct knowledge of the Buyout at the time of the transaction and preceding it.[317] Thus, the limitations period for

---

[314] *Bell Atl. Mobile Sys., Inc.*, 677 A.2d at 497.

[315] *Walton*, 294 A.3d at 96.

[316] *See id.*

[317] *See, e.g.*, JX0235; Buddenhagen Dep. 67:1–68:15.

Plaintiff's claim arising from the Buyout would not extend beyond three years from the accrual date in December 1995. Since Plaintiff did not bring this action until over two decades later, laches presumptively bars it.

As it relates to Plaintiff's other claims, I build on the above. In addition to all the foregoing information Buddenhagen had as a prior MEI consultant and his admitted knowledge of its hinky corporate governance, Buddenhagen made no effort to interact with MEI. Indeed, Buddenhagen only had two isolated interactions with Defendants in the 23 years that followed the non-renewal of his consultation agreement. First, in 1996, he returned certain records to MEI.[318] Second, in 2009, Buddenhagen attended a talk Clifford gave.[319] There, Clifford and Buddenhagen had a "two- or three-minute conversation," during which Buddenhagen asked Clifford "how the business was going[.]"[320] "[Clifford] basically indicated that [MEI] was still on hard times is my recollection."[321]

Aside from this, Buddenhagen had no contact with either of the Defendants until after the Merger. For over 23 years, between the Buyout

---

[318] *See* JX0778.

[319] Buddenhagen Dep. 72:14–73:13.

[320] *Id.*

[321] *Id.*

79

and the Merger, Buddenhagen never reached out to MEI.[322] Nor did Buddenhagen hear anything from MEI in his capacity as a stockholder.[323] Although Buddenhagen was aware of the Real Pirates exhibit, the Provincetown Museum, and the Yarmouth Museum, he never contacted anyone at MEI to inquire about MEI's revenues or profits from those sources or anything else for the matter.[324]

During those 23 years, MEI never held a stockholders' meeting, nor did it issue any reports to its stockholders.[325] Buddenhagen had extensive knowledge of MEI's business and was aware of MEI's revenue sources. Buddenhagen was also aware of how MEI operated—with little oversight, little regard for many corporate formalities, and at the whimsey of a fiduciary whose views he did not believe were "consistent with increasing the value of

---

[322] *Id.* at 73:14–74:1; TT112:17–20, 114:11–24 (Buddenhagen).

[323] Buddenhagen Dep. 73:14–74:1; TT112:17–20, 114:11–24 (Buddenhagen).

[324] *See* TT112:21–115:4 (Buddenhagen).

[325] Def's Post-Trial OB at 19 ("Bergman also assisted Defendants with housekeeping resolutions and consent due to the failure to hold annual meetings post-Whydah Partners"); *see generally* JX0584 (letter from Bergman to Defendants noting it has been many years since MEI held a stockholders' meeting); Bergman Dep. 150:19–22 ("the company . . . hadn't had a stockholders' meeting in many years").

MEI."[326]   Buddenhagen knew MEI was cash poor and issued stock as compensation and that Defendants had bought WPLP's interest in the Whydah Joint Venture.

This is not to say that a stockholder has an affirmative duty to monitor her fiduciaries. Stockholders remain entitled to rely on their fiduciaries, and that reliance tolls laches.[327]   But it does so if—and only if—the reliance is reasonable.[328]   When reliance is no longer reasonable, tolling under the equitable tolling doctrine ends. Accordingly, and as I noted above, "[e]ven where a defendant uses every fraudulent device at its disposal to mislead a victim or obfuscate the truth, no sanctuary from the statute will be offered to the dilatory plaintiff who was not or should not have been fooled."[329]   Here, Buddenhagen was not or should not have been fooled.

As a business expert with intimate knowledge of how MEI operated and no contact with MEI for over two decades, Buddenhagen was on inquiry notice of the fiduciary issues he uncovered in this action. For "[w]hatever is

---

[326] Buddenhagen Dep. 75:1–11.

[327] *Collis*, 287 A.3d at 1217–18 ("[T]he doctrine of equitable tolling stops the statute from running while a plaintiff has reasonably relied upon the competence and good faith of a fiduciary.").

[328] *Id.*

[329] *Id.*

notice calling for inquiry is notice of everything to which such inquiry might have led."[330]  Recall that to invoke the equitable tolling doctrine, "the facts underlying a claim [must be] so hidden that a reasonable plaintiff *could not* timely discover them."[331]  Here, although Buddenhagen may not have had specific knowledge of the intricacies of Defendants' alleged breaches of fiduciary duty, he certainly had enough information to cause a reasonable stockholder to raise his eyebrows and investigate further.[332]

It is not entirely clear when Plaintiff was placed on inquiry notice.  It may have been at the time of the 1995 Buyout.[333]  It may have been upon learning that MEI was "still on hard times" in 2009.  Or it could have been upon not receiving any notice of a stockholders meeting or report *for the 15th consecutive year*.

I need not reach any ultimate determination of this issue because I have already concluded the equitable tolling doctrine does not apply and

---

[330] *Whittington*, 991 A.2d at 8 n.9 (quoting *Bell Atl. Mobile Sys., Inc.*, 677 A.2d at 503 n. 7).

[331] *Jacam Chem. Co. Inc.*, 2024 WL 960180, at *8 (alteration in original) (emphasis added).

[332] *Id.* ("To put a plaintiff on '[i]nquiry notice does not require the plaintiff to have actual knowledge of the wrong, but merely an objective awareness of the facts giving rise to the wrong.'").

[333] JX0235; TT96:2–8 (Buddenhagen).

because even if it did apply, Plaintiff was on inquiry notice more than three years before he made his books and records demand.[334] Under either framework, this means tolling stopped, and the three-year limitations period expired before Plaintiff sued. Laches, then, presumptively bars all non-Merger claims derived from Defendants' discrete acts, and those claims find no sanctuary in the doctrine of equitable tolling. There are no extraordinary circumstances or factors that would render this conclusion inequitable. Thus, I conclude Plaintiff delayed unreasonably in bringing these claims in 2019.

### 2. Prejudice

The second element of laches requires courts to assess prejudice to the defendants. "Laches is fundamentally concerned with the prevention of inequity in permitting a claim to be enforced. Inequity for this purpose arises where there occurs some change in the condition or relation of the parties or the property involved in the pending lawsuit."[335] As here, when a plaintiff asserts an equitable claim for which he seeks equitable relief, "[t]he

---

[334] To determine whether the suit was brought within the limitations period, a court will usually look back from the date "the plaintiff filed suit, but when a plaintiff has engaged in diligent efforts to obtain books and records, the lookback date can be tied to those efforts[.]" *Walton*, 294 A.3d at 70.

[335] *Moelis*, 2024 WL 550750, at *8.

83

Court . . . may presume prejudice if the claim is brought after the analogous limitations period has expired."[336]

A principal concern when assessing laches prejudice is the extent to which a defendant's ability to mount a defense is impaired by the loss of evidence resulting from the passage of time. In *Fike v. Ruger*, our high court affirmed the trial court's conclusion, finding prejudice where a joint venturer and the joint venture's accountant both died. Those individuals, the court concluded, "would have been key witnesses in refuting Plaintiffs' claims."[337] In reaching that conclusion, the Delaware Supreme Court relied on *Skouras v. Admiralty Enterprises, Inc.* and recounted the Court of Chancery's conclusion that "prejudice can be found where a party dies while the other party sits on its claim."[338] Similarly, in *Cooch v. Grier*, this Court explained that "laches will apply where there is an unexplained delay in prosecuting the claim until death has closed the lips of the interested parties."[339] Likewise, "[t]he Delaware Supreme Court has stated that the doctrine of

---

[336] *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 979 (Del. Ch. 2016).

[337] *Ruger*, 752 A.2d at 114.

[338] *Id.* (citing *Skouras v. Admiralty Enterprises, Inc.*, 386 A.2d 674 (Del. Ch. 1978)).

[339] *Hudak v. Procek*, 806 A.2d 140, 161 (Del. 2002) (Holland, J., dissenting) (quoting *Cooch v. Grier*, 59 A.2d 282, 287 (Del. Ch. 1948) and collecting cases).

84

laches is founded on 'the difficulty of doing entire justice, when the original transactions have become obscure by time, and the evidence may be lost, or depends on the precarious memory of witnesses.'"[340]

In addition to Plaintiff's unreasonable delay being "presume[d] prejudic[ial],"[341] the substantial actual prejudice Defendants face here is clear. Lazier—a defendant in this action—died during its pendency. Kinkor—who played a significant role at MEI as an accountant and bookkeeper during the years in question—passed away in 2013. Both Lazier and Kinkor would have been key witnesses in disproving Plaintiff's allegations but died before trial, with Plaintiff having long slumbered on his claims.

Indeed, the availability of living witnesses willing and able to testify at trial proved scarce and led, in part, to a dramatic moment in the courtroom. Following Clifford's testimony about the events at the Harvard Club, Plaintiff's counsel transitioned to a discussion about Vince Murphy, whom Clifford repeatedly insisted had passed away. But—to everyone's surprise— Plaintiff's counsel produced a "hostage" photo[342] of Murphy holding a

---

[340] *Deputy v. Deputy*, 2020 WL 1018554, at \*53 (Del. Ch. Mar. 2, 2020) (quoting *Hudak*, 806 A.2d at 159).

[341] *Kraft*, 145 A.3d at 979.

[342] TT310:20–24 (Plaintiff's counsel).

newspaper to display the date—in essence, proof of life. Clifford's response can only be described as stunned disbelief: "Oh. . . . Oh. My God. I had no -- I thought he had passed away. That is great news."[343] This surprise was felt by all.[344]

I include this to illustrate the sheer magnitude of evidentiary loss that has occurred over the past thirty years. Likewise, the primary witnesses at trial—Clifford and Buddenhagen—are both septuagenarians tasked with recalling the specifics of events that, in some instances, occurred nearly half a lifetime ago. It is no wonder the parties themselves have such difficulty constructing a cohesive narrative in their papers.

The record also reflects the significant effects of flooding that destroyed many documents. Ken Kinkor's widow, Marti Kinkor, explained:

> [T]here was a horrible flood in the P'town building a few years back. Margot can give you a better history on that, and she may still have the video she took of it raining indoors. A lot of stuff was ruined in that flood – boxes of paperwork turned to mush and destroyed, so who knows what that included.[345]

---

[343] TT310:12–311:6 (Clifford).

[344] As noted above, Plaintiff's counsel offered to call Murphy as a witness and the parties discussed holding an evidentiary hearing after trial. But nothing came of these discussions.

[345] JX0810.

This corroborated Clifford's testimony that they "had a massive flood" and "[a]ll the paperwork was destroyed, including all of Ken's files."[346]

The clear prejudice here illustrates a basic principle: with time, evidence deteriorates. Memories fade, witnesses pass on, and evidence is lost or destroyed.[347] Thus, "individuals and entities are entitled to defend against claims in a reasonable amount of time, or not at all."[348]

I conclude, then, that Plaintiff's non-Merger claims are time-barred by laches.[349]

---

[346] TT423:14–17 (Clifford); *see also* 393:3–6 ("I can't honestly say where a lot of things came from or what was done, based on, you know, the floods and all we had.").

[347] *See Daugherty v. Highland Cap. Mgmt., L.P.*, 2018 WL 3217738, at *7 (Del. Ch. June 29, 2018) ("The purpose for employing laches is partially similar to the purpose for respecting a limitations period at law: memories grow stale with time, evidence becomes lost, and individuals and entities are entitled to defend against claims in a reasonable amount of time, or not at all."); *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2011 WL 2682898, at *6 (Del. Ch. July 11, 2011) ("Statutes of limitation, like the equitable doctrine of laches, in their conclusive effects are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.") (quoting *Order of R.R. Tel. v. Ry. Express Agency*, 321 U.S. 342, 348–49 (1944)).

[348] *Daugherty*, 2018 WL 3217738, at *7.

[349] Separately, Defendants argue the *Whydah* rights may revert back to MUS for the purported non-payment by MEI of a $150,000 sum in the 1980's. *See* Def's Post-Trial RB at 3, 14. But, like Plaintiff's miscellaneous arguments, Defendants do little to develop this argument in any meaningful way. Whether any such argument would fail for laches or some other reason,

**B. The 2018 Merger**

Plaintiff raises two separate challenges to the Merger. First, he argues Defendants lacked the requisite votes to approve the Merger, so the Merger is invalid. Next, he argues the Merger was not entirely fair.

**1. Ownership**

No party disputes that the Merger required approval by a majority of MEI's issued and outstanding shares. Plaintiff argues, however, that Defendants did not validly hold a majority of MEI's issued and outstanding stock at the time of the Merger because the Board never voted to issue Clifford 2.1 million shares at the 1996 Meeting.

Delaware courts often give little or no positive evidentiary weight to minutes that are not prepared with even a modicum of contemporaneity to the event they purport to record.[350] This is all the more true here, where the

---

I do not need to delve into further given that Defendants have, at a minimum, waived it for purposes of this proceeding.

[350] *See, e.g.*, *City of Hialeah Emps.' Ret. Sys. on Behalf of nCino, Inc. v. Insight Venture P'rs, LLC*, 2023 WL 8948218, at *2 n.6 (Del. Ch. Dec. 28, 2023) (explaining that a delay in which directors approved board minutes months after the meeting date is "unsettling" and would require the court to "treat the minutes with skepticism at an evidentiary stage"); *In re Columbia Pipeline Grp., Merger Litig.*, 299 A.3d 393, 449 (Del. Ch. 2023) (noting that delayed after-the-fact minute preparation "undercuts [the minutes'] evidentiary value"); *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 191 (Del. Ch. 2007) (stating that "tardy, omnibus consideration of meeting minutes [are], to state the obvious, not confidence-inspiring" where approval

draft 1996 minutes appear to have been falsified and are materially inconsistent with each other.[351]

As set forth in detail above, the unrebutted evidence shows Defendants created over a dozen sets of falsified draft minutes in the decade that followed the 1996 Meeting. Bergman noted, "you can tell from reviewing the records a lot of corporate formalities haven't been followed."[352] But this is an understatement. Beyond a failure to follow corporate formalities throughout many of MEI's early years, Defendants actively falsified documents designed

came after a delay of several months but followed the initiation of litigation) (footnote omitted); Leo E. Strine, Jr., *Minutes Are Worth the Minutes: Good Documentation Practices Improve Board Deliberations and Reduce Regulatory and Litigation Risk*, Fordham J. Corp. & Fin. L. (forthcoming) (manuscript at 14–15), https://ssrn.com/abstract=4748876 (noting that "Delaware courts have refused to give evidentiary credit to minutes that were prepared long after the events in question," and "when directors approve a large bunch of minutes many months after the meetings that occurred, there is a rational concern their memories of the meetings have faded and their review of the minutes was cursory and perfunctory, rather than careful").

[351] *Pfizer Inc. v. Advanced Monobloc Corp.*, 1999 WL 743927, at *9 n.27 (Del. Super. Sept. 2, 1999) (citing *Box v. Box*, 1996 WL 73575 (Del. Ch. Feb. 15, 1996), *aff'd*, 687 A.2d 572 (Del. 1996) and noting that "Chancellor Allen excluded a set of draft minutes of a meeting when 1) it was . . . customary practice of all four brothers to sign [and] approve the minutes, and in this situation they did not; 2) when the drafts were not circulated to those assuredly in attendance, nor were the final minutes distributed to the directors; 3) where the minutes contained visible errors; and 4) where another set of falsified minutes were found").

[352] Bergman Dep. 69:10–23. For a discussion of best practices for minute documentation, *see* Strine, *supra*.

to rewrite history, at least as it relates to the draft minutes for the 1996 Meeting.[353]   Accordingly, even acknowledging the state of the evidentiary record, it seems likely, if not nearly certain, that the Board did not vote to issue Clifford 2.1 million shares in 1996.

Nonetheless, there are a variety of other exhibits in the record that I am unable to square with Plaintiff's position that Defendants did not hold a majority of MEI's stock at the time of the Merger.  Indeed, the preponderance of the evidence supports the opposite conclusion.

As I discussed above, the Board's intention from 2004 onward was demonstrably clear.  And the preponderance of the evidence records specific formal acts the Board took to give effect to those intentions.[354]  It documents those efforts through draft and finalized Board meeting minutes that reflect the attendance of an attorney and clear affirmative votes by the Board to issue Clifford the disputed stock.[355]   The preponderance of the evidence further supports the conclusion that MEI actually issued Clifford the stock in

---

[353] Delaware Courts have recognized that "[u]nder appropriate circumstances, the falsification of a corporation's minutes might constitute a breach of a director's duty of candor." *Oberly v. Kirby*, 592 A.2d 445, 465 (Del. 1991).

[354] *See, e.g.*, JX0340.

[355] *Id.*

or after April 2004 through Certificate 1370.[356] Certificate 1370 bears Ruotolo's signature as MEI's secretary—a position the Board elected her to at the April 2004 meeting.[357] Bergman's assessment of MEI's records and conclusion that Certificate 1370 was issued on April 1, 2004, also supports this version of events.[358]

Plaintiff makes no effort in his post-trial papers to wrestle with the April 2004 Board meeting minutes, the signed and finalized January 2009 Board meeting minutes, or Certificate 1370. Nor does Plaintiff's post-trial briefing include even a single reference to any of these exhibits.[359]

For their part, Defendants argue that Bergman concluded Defendants held a majority of MEI's stock based on Kinkor and Stevens' work in 2010.[360] Although Plaintiff engages with this argument to the extent it suggests

---

[356] *See* JX1168; JX1177. The draft set of minutes from the Board's April 2004 meeting recorded a Board vote to issue Clifford 2.1 million shares for his work from 1990–1996 and an additional 2 million shares for his subsequent work from 1997–2004. *See* JX0327. Stock certificate 1373— which Plaintiff does not challenge—corresponds to this latter issuance and provides ancillary support to the notion that the Board voted and MEI issued Clifford the disputed shares. *See* JX1170.

[357] *See* JX0327.

[358] *See, e.g.*, JX1177.

[359] *See* JX0327; JX0340; JX1168.

[360] *See* JX0573.

Defendants' reliance on Bergman's advice, Plaintiff makes no effort to explore the factual predicate Bergman referenced. Bergman's reference to the "business" Kinkor and Stevens "effected in 2010" refers to acts they took in December 2009 and spring and fall of 2010 to effectuate the Board's votes at the January 2009 meeting and to transfer stock between Clifford and Lazier.[361]

I acknowledge and give full weight to the serious issues Plaintiff raised surrounding the draft 1996 Meeting minutes. But, like ships passing in the night, it is entirely possible—and indeed more likely than not—that, over the course of a decade or more, Defendants both acted to fabricate draft minutes of the 1996 Meeting and also later voted to issue, and then issued, themselves the disputed shares of stock.[362] Since these are not mutually exclusive positions and Plaintiff does not meaningfully engage with or challenge the conclusions that form the basis for Defendants' argument on this issue, I am left to conclude that Defendants held a majority of MEI's stock at the time of

---

[361] *Compare id., with* JX0346, JX0327, *and* JX0394 at 17.

[362] Defendants were the sole members of the Board by the time of the January 2009 Board meeting. *See* JX0340. Given my other findings in this matter, it would frankly be naïve to think that Defendants did not undertake whatever actions might have remained to vote to issue, and then issue, themselves the disputed shares. This is obviously not to say that the issuance was entirely fair. That question, however, is subject to laches for the reasons I have already described at length in this decision.

the Merger. And indeed, this is the conclusion the preponderance of the evidence supports. Accordingly, I must reject Plaintiff's challenge to the Merger based on Defendants' alleged failure to hold the requisite shares.

## 2. Entire Fairness

Plaintiff's remaining challenge attacks the Merger's fairness. On this issue, Plaintiff prevails. As directors of MEI, a Delaware corporation, Defendants were bound by the fiduciary duty of loyalty.[363] As directors and the majority stockholders of both the entities involved in the Merger—MEI and International—Defendants stood on both sides of this transaction. This was unquestionably an interested, self-dealing transaction from which Defendants stood to gain substantial personal benefits by diluting MEI's minority stockholders and depriving them of the very significant upside provided to MEI and its stockholders under the Sliding Scale.[364]

---

[363] The parties agree that at all times relevant to this action, Clifford and Lazier were MEI directors. Pre-Trial Stip. ¶¶ 2–3. As directors of a Delaware corporation, Defendants "owe[d] two overarching fiduciary duties— the duty of care and the duty of loyalty." *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1049 (Del. 2021).

[364] *See Pfeffer v. Redstone*, 965 A.2d 676, 690 (Del. 2009) ("A transaction is interested where directors appear on both sides of a transaction or expect to derive a financial benefit from it that does not 'devolve[] upon the corporation or all stockholders generally.'"); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1169 (Del. 1995) ("Traditionally, the term 'self-dealing'

"The *requirement of fairness is unflinching in its demand* that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts."[365]  Here, Defendants accepted this as their burden.[366]

"Delaware's most onerous standard of review is the entire fairness test. When entire fairness governs, the defendants must establish 'to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair price.'"[367]

> The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained.  The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.  However, the test for fairness is not a bifurcated one as between fair dealing

---

describes the 'situation when a [corporate fiduciary] is on both sides of a transaction.'") (alteration in original).

[365] *In re Tesla Motors, Inc. S'holder Litig.*, 298 A.3d 667, 700 (Del. 2023) (emphasis in original)(quoting *Weinberger v. UPO, Inc.*, 457 A.2d 701, 710 (Del. 1983)).

[366] Def's Post-Trial OB at 62 ("Defendants acknowledge that they have the obligation to demonstrate the fairness of the Merger").

[367] *New Enter. Assocs. 14, L.P. v. Rich*, 292 A.3d 112, 159 (Del. Ch. 2023) (quoting *Cinerama*, 663 A.2d at 1163).

and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness.[368]

When conducting this assessment, "[t]he Delaware Supreme Court has characterized the proper 'test of fairness' as whether 'the minority stockholder shall receive the substantial equivalent in value of what he had before.'"[369]

### a. Process

"The element of 'fair dealing' focuses upon the conduct of the corporate fiduciaries in effectuating the transaction." When discussing fair process . . . the Delaware Supreme Court encouraged this court to focus on what it refers to as the "*Weinberger* factors." Those factors are "how the deal was initiated and timed, how it was structured and negotiated, and how it was approved[.]"[370]

Here, there was no semblance of a fair process. To the extent the Merger can be considered at all "negotiated," it was negotiated by and between Defendants, and no one other than Clifford and Lazier negotiated

---

[368] *In re Tesla Motors, Inc. S'holder Litig.*, 298 A.3d at 700 (quoting *Weinberger*, 457 A.2d at 711).

[369] *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, at *29 (Del. Ch. July 21, 2017) (quoting *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 114 (1952)), *aff'd*, 184 A.3d 1291 (Del. 2018).

[370] *Tornetta v. Musk*, 310 A.3d 430, 527 (Del. Ch. 2024) (footnotes omitted) (citing *In re Tesla Motors, Inc. S'holder Litig.*, 298 A.3d at 702).

the Merger on MEI's behalf.[371]  Defendants acted with the intent to dilute MEI's minority stockholders through the Merger while seizing a predetermined percentage of New-MEI's stock and eliminating the Sliding Scale.[372]  Defendants even split International's stock "on a 40,860.6 for one basis"[373] shortly before the Merger, so it would "look better to the stockholders of MEI."[374]

Against Bergman's advice, there was no special committee, no financial advisor, and no fairness opinion.[375]  There was also no Board meeting to

---

[371] Bergman Dep. 148:21–24; TT554:8–13 (Clifford) ("Q. . . . Were you negotiating with yourselves in this merger, essentially?  A. Yeah.").

[372] *See* JX0671 at 1.

[373] *Id.*

[374] JX0669 ("This doesn't change anything from a practical perspective, but it does look better to the stockholders of MEI."); Bergman Dep. 133:7–135:9 (suggesting Defendants split International's stock "solely to make it look better").

[375] TT555:9–557:9 (Clifford); Bergman Dep. 149:1–10 ("MEI did not engage advisors to advise it on the value [it was receiving in the Merger.]").  Notwithstanding Defendants' majority holding of MEI's stock at the time of the Merger, they did not seek to add independent directors to evaluate the transaction or to negotiate for MEI.  Given Defendants' beliefs about the very substantial values involved, which I discuss below, Defendants would have been wise to heed Bergman's advice to implement mechanisms designed to enhance the likelihood of a finding of fairness.  Defendants, however, chose to take the opposite route.

consider the Merger in any formal capacity.[376]  Likewise, MEI's minority stockholders were kept entirely in the dark as to the Merger until after Defendants approved the Merger Agreement as both directors and MEI's majority stockholders.

I conclude, then—as Defendants' conduct makes eminently clear—that Defendants acted in a manner that was wholly devoid of any meaningful attempt to employ a fair process.  The evidence on this point is so incontrovertible that Defendants, bearing the burden, even expressly admit that "the process was lacking" and "flawed."[377]  Indeed, it is frankly difficult to think of even a single act Defendants took that might suggest they intended anything other than for the process here to be manifestly unfair.

### b. Price

When considering fair price, "the court looks at the economic and financial considerations of the transaction to determine if it was substantively fair. . . .  Instead of picking a single number, the court's task is to determine whether the transaction price falls within a range of fairness."[378]

---

[376] TT555:9–557:9 (Clifford).

[377] Def's Post-Trial OB at 65, 40.

[378] *Tornetta*, 310 A.3d at 533 (quotation marks omitted) (footnote omitted).

Although Defendants agree the process was unfair, they assert that "any process flaws were cleansed by fair value."[379] But, "[g]iven the unitary nature of the test, findings in one area may seep into the findings of the other. As a result, 'a fair process usually results in a fair price.' The opposite is also true: 'an unfair process can infect the price."[380]

In their arguments on price Defendants look for solace in the "range of fairness" our courts consider. But "[t]he range of fairness permits a court to give some degree of deference to fiduciaries who have acted properly; it is not a rigid rule that permits controllers to impose barely fair transactions."[381] Thus, "[t]he range of fairness concept has most salience when the controller has established a process that simulates arm's-length bargaining, supported by appropriate procedural protections."[382]

Similarly, this Court has noted in prior decisions that, although price may fall within the range of fairness, a clear failure to show fair process may leave the Court unconvinced that the fiduciary "misconduct did not taint the

---

[379] Def's Post-Trial OB at 40.

[380] *Tornetta*, 310 A.3d at 527 (footnote omitted) (quoting *In re Tesla Motors, Inc. S'holder Litig.*, 298 A.3d at 702).

[381] *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 466 (Del. Ch. 2011).

[382] *Id.* at 467.

price."[383]  I certainly have that same concern.  Except, here, Defendants also do not show the price fell within the range of fairness.

Before the Merger, MEI's minority stockholders held 49% of its stock. MEI, in turn, had a right to distributions under the JVA's Sliding Scale. Recall that the Sliding Scale functions on $6 million increments.  And with each rung of the ladder, it shifts an incrementally larger portion of the marginal dollar to MEI and away from International.  It is set forth below:[384]

| Column A | Column B | Column C | Column D |
| --- | --- | --- | --- |
| | Operations Fee to | | |
| Level of Proceeds | Explorations | Maritime | Partnership |
| $          —  6,000,000 | 20% | 0% | 80% |
| 6,000,001 — 12,000,000 | 0% | 30% | 70% |
| 12,000,001 — 18,000,000 | 0% | 40% | 60% |
| 18,000,001 — 24,000,000 | 0% | 50% | 50% |
| 24,000,001 — 30,000,000 | 0% | 55% | 45% |
| 30,000,001 — 36,000,000 | 0% | 60% | 40% |
| 36,000,001 — 42,000,000 | 0% | 65% | 35% |
| 42,000,001 — 48,000,000 | 0% | 70% | 30% |
| 48,000,001 — 54,000,000 | 0% | 75% | 25% |
| 54,000,001 — and up | 0% | 80% | 20% |

This was designed such that, in the event of a large payout, MEI and its stockholders would receive disproportionately more than International.  Over

---

[383] *See id.* ("finding that although price fell within lower range of fairness, 'The defendants have failed to persuade me that HMG would not have gotten a materially higher value for Wallingford and the Grossman's Portfolio had Gray and Fieber come clean about Gray's interest.  That is, they have not convinced me that their misconduct did not taint the price to HMG's disadvantage.'") (quoting *HMG/Courtland Properties, Inc. v. Gray*, 749 A.2d 94, 116–17 (Del. Ch. 1999)).

[384] JX0045 at 8–9.  Recall that the JVA refers to MFC as "Maritime," MEI as "Explorations," and WPLP as the "Partnership."  *See id.*

the years, Defendants made several attempts to lock MEI's minority stockholders into the lowest rung of the ladder. The Merger was another attempt to do just that.

Defendants' assertion of fair price is predicated, as Bergman explained, on their understanding of how revenues are divided between MEI and International under the JVA. Bergman explained what he understood to be Defendants' "goal of the merger transaction," which was "to end up with Barry holding 75% of the surviving company (new MEI), Bob Lazier holding 15% of new MEI and other MEI stockholders holding 9% of new MEI, with Bob and Barry having a preference on dividends and distributions by new MEI of $4,000,000."[385] These percentages and the corresponding exchange ratio used in the Merger were "based off of essentially the revenue split attributable to the company pre-merger and compensation to Barry and Bob Lazier for services and money that had been put into the company."[386]

---

[385] JX0671 at 1.

[386] *See* Bergman Dep. 137:4–138:6. Even after trial, it remains unclear how Defendants calculated their "compensation" for resources they purportedly contributed to MEI. As noted above, it seems Defendants themselves may have provided Bergman with the $4 million preference figure for their preferred stock, and they did so while having little to support the number proposed. In addition, I note that Lazier, a sophisticated business owner, real estate developer, and "nationally recognized race car driver[,]" may have been a driving force for the preferred stock given Clifford's claim at trial not to understand what preferred stock is. TT224:4–8 (Clifford) ("I

100

As it turned out, MEI's minority stockholders would end up holding roughly 9.15% of New-MEI, and even those shares remained subordinate to Defendants' $4 million dividend and liquidation preference.[387] This might have been all well and good if MEI were not a treasure-hunting company that had promised its stockholders tremendous upside in the event it struck gold. That is, part of the reason MEI's minority stockholders either invested in MEI by purchasing stock or were willing to receive stock as compensation for their services was rooted in the nature of the payout structure to MEI under the JVA.[388] MEI's minority stockholders were not disgruntled with years of famine if they could feast on high returns if MEI ever found the mother lode.

---

didn't know what preferred stock was. So I -- I still don't."); JX0005; JX0019; JX0027. As to "compensation," the trial record suggests that, in reality, Defendants have done little actual work through MEI or the Whydah Joint Venture since at least 2006. And, although I have barred the non-Merger claims on laches grounds, the record nonetheless strongly suggests that, since 2006, Defendants diverted whatever profits were derived from the *Whydah* site and its artifacts to their pockets via a host of other entities only Defendants owned. Thus, having issued themselves millions of shares of MEI stock for purported past services, diverted all or nearly all profits to themselves, and seemingly done little actual work through MEI or the Whydah Joint Venture, the notion that Defendants could be said to be entitled to further "compensation" for unidentified "services and money" is difficult to fathom. In any event, Defendants have unquestionably failed to carry their burden on this point.

[387] *See* JX0689.

[388] *E.g.*, Clifford Dep. Vol. I 34:20-25 ("Other people were involved for just money[.]"). And indeed, this seems to have motivated some of WPLP's investors too, who sat across from MEI's minority stockholders under the

Put another way, MEI's minority stockholders had a high-risk tolerance so long as the risk was accompanied by the opportunity to collect a correspondingly high reward, which the JVA's Sliding Scale provided to MEI. Indeed, no one buys lottery tickets expecting to win every time. And in like fashion, almost no one invests in a treasure-hunting company expecting consistent year-over-year returns. Instead, both invest for a chance to share in the profits if there is ever a significant payout—as might be the case here if MEI discovers the rumored loot and/or sells off its already significant collection of treasure.[389]

---

Sliding Scale. When Bernstein and Betts invested in MEI and the Whydah Joint Venture through WPLP, they did so under the belief that MEI would excavate whatever they found on the *Whydah*—hoping to hit the mother lode and share in the profits therefrom. *See* Betts Dep. 50:20–51:3, 20:22–21:13, 68:21–69:2. But, given the highly speculative nature of the investment, they structured the Sliding Scale to favor WPLP on the lower rungs so that WPLP got "the lion's share until [it] got at least [its $]6 million back." *See id.* at 76:23–77:5, 52:7–12. Although some of WPLP's investment was driven by the "fun" novelty of investing in the only known pirate shipwreck, as Betts explained, WPLP's investors were also motivated by the chance that MEI "will find something." *Id.* at 50:20–51:7. So, when Bernstein and Betts sought to exit the Whydah Joint Venture through the Buyout, they took 681 of the *Whydah* coins to give to their investors. They reasoned that since they "didn't hit the mother lo[de]" the coins—although supposedly "just a token"— would provide some degree of consolation. *Id.* at 68:21–69:2.

[389] Separately, I note that Defendants do not advance a supported position that any value the *Whydah* treasure has is stymied by the "racial controversy" (JX0228) surrounding the *Whydah*'s history. Dr. Margolin also does not rely on this history to explain his valuation. To the contrary, Dr. Margolin suggests Clifford "rehabilitated the *Whydah* as an asset by

Although once happy to compensate MEI's service providers and investors with stock, Defendants soured on the idea when the utility of those resources faded—especially considering the value-shifting implications of the Sliding Scale. On multiple occasions, Defendants tried to take this upside under the Sliding Scale for themselves. First, they tried to use the backdated draft 1996 Meeting minutes to accomplish this goal. Those draft minutes, as manipulated by Defendants, purport to reflect Board approval of one or another proposal by Lazier. These proposals sought to replace the JVA's Sliding Scale with either a 25–75 or a 1/3–2/3 fixed revenue split. Under both proposals, International would take home the larger distribution and would extinguish MEI's (and with it, the minority stockholders') claim on any significant cash flows to the Whydah Joint Venture derived from the upside provided under the Sliding Scale.

When they realized this would not work, Defendants sought to merge MEI and International sometime between 2004 and 2011—again, hoping to lock MEI and the minority stockholders into a lower distribution, thereby

reconciling its slaver-era with the relative racial equality of its pirate-era, including through the 1999 publication of the book *Expedition Whydah*." JX1015 at 11. As I noted above, Clifford's trial testimony corroborates this conclusion.

103

taking the upside under the Sliding Scale for themselves through their complete ownership of International.[390]

Defendants ultimately abandoned their initial plans for a merger. But they then revived those plans, seemingly upon one or more recent finds that led Defendants to believe they were on the cusp of uncovering significant treasure.

Assuming, as Defendants have argued very strongly, that the JVA survived until the Merger,[391] Defendants still do not meet their burden of showing the price was within the range of fairness. In relevant part, the Merger extinguished the minority stockholders' upside under the Sliding Scale—relegating their interests in New-MEI to ownership corresponding to the Sliding Scale's bottom rung. This placed MEI's minority stockholders in a

---

[390] Indeed, contemporaneous evidence suggests Defendants had considered selling the *Whydah* enterprises outright—along with the treasure they had uncovered. But they felt the need to combine MEI and International before doing so—which would terminate the JVA and avoid triggering the upper rungs of the Sliding Scale. *See, e.g.*, JX0561 at 7.

[391] As noted above, I have serious reservations about whether the JVA remained intact. But I need not resolve that issue because, even assuming the JVA continued, Defendants do not meet their burden of showing entire fairness. If I were to conclude the JVA terminated before the Merger, Defendants' heavy reliance on its continuation through the effective time of the Merger for their fair price argument would compel me also to conclude that Defendants failed to meet their burden to show entire fairness.

manifestly worse position than they were in before the Merger. A position, I note, that Defendants do not show falls within the range of fairness.

Defendants advance three primary arguments in an attempt to show the Merger price was fair to MEI's minority stockholders. First, they look to Dr. Margolin's expert opinion that the Merger was fair; second, they point to Bergman's belief the consideration was fair; and third, they assert they personally believed the Merger was fair.

### i. Dr. Margolin

Dr. Margolin asserts the prior valuations of the salvaged *Whydah* coins track the volatility in the spot price of silver. Thus, he applies a value correlating to the volatility in the price of silver at the time of the Merger to the remaining coins and asserts the coins and all the *Whydah*'s salvaged artifacts are valued at $1.08 million.[392] Defendants assert that Dr. Margolin "took into account cash flows generated by museum operations ($99,445 EBITDA) [and] the value of the assets in a sale ($1 million) and apportioned those interests in accordance with the terms of the JVA . . . ."[393] When apportioning those values under the JVA to assess the Merger's fairness, Dr. Margolin assumed MEI's cashflows "would not generate sufficient funds for

---

[392] JX1015 at 21–22.

[393] Def's Post-Trial OB at 32 (citations omitted).

the parties to emerge from the first bracket of the waterfall in Section 6" (*i.e.*, the Sliding Scale) of the JVA.[394]   From this implied value, Dr. Margolin compares MEI's value to International's—which he estimates to be $1.33 million—before concluding the Merger fell within the range of fairness.

I reject Dr. Margolin's assessment of fairness because the evidence shows the actual value of the assets properly apportionable to MEI under the Sliding Scale likely exceeds the Sliding Scale's first rung.  This is relevant to whether the price was fair because the stock-for-stock exchange ratio used in the Merger was calibrated to assume the minority stockholders' claim on Whydah Joint Venture assets and cashflows would never exceed the first rung.  If they were to exceed the first rung in the economically relevant period, MEI's value would increase in relation to International's value by an amount corresponding to the progressive application of the rates used at each of the Sliding Scale's subsequent rungs.[395]  Thus, at best, it makes it unclear

---

[394] *Id.* at 32, 34; *see also* JX1015 at 6 (cashflow distribution chart).

[395] As may already be apparent from the foregoing, and setting aside Defendants' preferred stock, the 9.15% of New-MEI's stock the minority stockholders owned after the Merger might be viewed as roughly corresponding, from an economic perspective, to their 49% pre-Merger holding in MEI.  But that would be true only so long as MEI is viewed as an entity entitled to only 20% of the Whydah Joint Venture.  This changes, however, as soon as the value of the salvaged and un-salvaged treasure and artifacts, and any related cash flows, are determined to have significant value, as the evidentiary record in this matter compels.  In that case, as the

106

whether the price fell within the range of fairness. And, at worst, it shows the Merger's price was not fair. Either way, Defendants do not meet their burden of showing entire fairness.

Here, several considerations undermine Dr. Margolin's critical assumption that the Whydah Joint Venture's cash flows "will not aggregate to $6 million over an economically relevant period."[396]

First, Dr. Margolin appears to employ a problematic methodology for valuing the *Whydah* treasure. Dr. Margolin uses a correlative to the spot price of silver as the basis for his valuation of the recovered coins. But doing so ignores the value the coins may have as a collection. In instances like this—where an entity is attempting to value *the only recovered pirate treasure in the world*—it seems the collection may be worth far more than the

values involved exceed the first rung of the Sliding Scale, the value accorded to MEI quickly grows given the disproportionate share accorded to MEI with each successive rung up the ladder. Stated another way, consider what happens when the treasure, artifacts, and cashflows are based on an assumed liquidation value and the perceived likelihood is high that the value of the assets being hypothetically liquidated far exceeds the Sliding Scale's first rung—$6 million. In that case, one must account for the progressive, value-shifting implications of the Sliding Scale's upper rungs when considering the value of the claim on the *Whydah* assets corresponding to the minority stockholders' holding in MEI. As the perceived value and probability of realizing the value increases, the value of the minority stockholders' 9.15% stake in New-MEI looks smaller and smaller when compared to their former 49% stake in a company entitled to progressively larger distributions on the marginal dollar, as was the case under the Sliding Scale.

[396] JX1015 at 40.

107

sum of its parts. Indeed, if one were to begin selling the Vanderbilt Mansion stone by stone, he or she could not be surprised when they sell correspondingly near the spot price for Indiana limestone.

Here—given the incredibly unique nature of the coins—there may be a fair amount of trinket-level novelty associated with buying individual coins that causes them to sell at a premium. But even if there is, piecemeal sale (or valuation) of the coins is not the way to maximize the value of such a unique and valuable collection of the only identified pirate treasure in existence.

Clifford seemed in accord. As Wroe explained at his deposition, Clifford was only interested in selling the *Whydah* treasure if "it could be sold in total . . . [or] as a total collection, so to speak."[397] Indeed, Sotheby's 1992 auction price valuation, on which Dr. Margolin relies in basing his valuation methodology on a correlative to the spot price of silver, also undercuts Dr. Margolin's conclusion. As I noted above, a letter accompanying the Sotheby's valuation expressly provides that the collection could sell above its estimated

---

[397] Wroe Dep. 76:13–18; *see also* JX0488 (December 2016 email from Clifford to Wroe: "My concern is about putting individual coins on the market, as I believe it would devalue the entire collection, and fly in the face of all I've said re keeping the collection together.").

value if sold as a collection. The letter concluded that, "[i]f this happens, it is difficult to estimate the collection's potential."[398]

Moreover, Dr. Margolin's decision to base his opinion on the supposed correlative volatility in the spot price of silver as the appropriate method to value the treasure was based only on the early valuations of the treasure between 1992 and 2011. But between 2011 and the Merger, at least seven of the coins were sold. As Thompson's rebuttal report shows, when actually applied to the sales of the various *Whydah* coins between 2011 and 2018, the prices the coins fetched fell nowhere near the spot price of silver at the time, nor did they appear to bear any meaningful relationship to the volatility in the price of silver.[399] Those coins sold for between $6,169 and $16,450.[400] In

---

[398] JX0206.

[399] *See* JX1016 at 24. For his part, Thompson began with Sedwick's $10,000 per coin estimate. But Thompson recognized the economic reality that if one tries to sell all the *Whydah* coins individually on the market at the same time, such an attempt would be accompanied by the economically depressing effect that tends to follow from flooding the market with the sale of otherwise rare items. Thompson accounts for these effects by employing a blockage discount to Sedwick's estimate. Rather than grapple with the application of discount rates, Dr. Margolin asserts it would take many years to sell all the *Whydah* coins near the price Sedwick estimated—$10,000 per coin. Thus, Dr. Margolin rejects the applicability of Sedwick's market estimate altogether and opts for his silver-based approach. If anything, these considerations suggest that, so long as the coins are rare, they likely have a value far in excess of Dr. Margolin's $44 per coin correlative to the spot price of silver. Both experts, however, overlook a painfully simple alternative to selling the coins on the market in piecemeal fashion. That is, selling the

contrast to these figures, Defendants assert Dr. Margolin's valuation works out to $44 per coin.[401]

In addition to the recovered coins in the existing collection being far more valuable than Dr. Margolin seems to suggest, Dr. Margolin also overlooked other key sources of value for MEI and its stockholders that make it even more likely the Whydah Joint Venture's future cashflows would have exceeded the first rung of the Sliding Scale.

As noted above, Dr. Margolin makes no effort to value the *Whydah* wreck site—which Clifford maintains is mostly unrecovered. Numerous internal documents and Clifford's own trial testimony suggest that "[l]ess than 15% of the treasure has been extracted."[402] MEI recognized that the "[t]he potential of the treasure alone is in the hundreds of millions of $[.]"[403]

---

coins in the only manner Clifford would be interested in selling them—as an entire collection. Selling the coins in this manner would keep the coins rare, in that the entire collection of the only known pirate treasure horde has only one owner. Perhaps Sedwick's approach would be less applicable to such a sale since that appraisal was based on the prices that individual coins were sold for at auction. But it seems similarly unlikely that such a sale would fall anywhere near the figures Dr. Margolin advances.

[400] *See id.*

[401] Def's Post-Trial OB at 60.

[402] JX1034 at 12.

[403] *Id.*

And Sedwick, who seems to have perhaps the most relevant background and experience in these circumstances, suggested he expects the unrecovered treasure to be worth upwards of $1 billion.[404]

Similarly, Clifford's testimony and contemporaneous evidence also showed that Defendants believed they were on the cusp of uncovering significant treasure from the *Whydah*. In making this assessment, I note that Clifford is the only person involved in this action who could provide a first-hand account of the state of the *Whydah*'s wreck site. He was also the only witness at trial who conducted dives on the wreckage and could provide any sort of reliable estimation of the excavation progress and remaining value. Observing his demeanor at trial, Clifford was obviously—and understandably—excited about the wreck site and eager to tell an audience about it. I found his testimony on these issues credible. I am inclined, then, to take his word on this, especially since it is against his interest to the extent this litigation is concerned.

Likewise, this Court often considers internal valuations and forecasts as indications of value.[405] Here, Defendants' internal documents corroborate

---

[404] *See* JX0701; JX0706.

[405] *See In re Cellular Tel. P'ship Litig.*, 2022 WL 698112, at *28–29 (Del. Ch. Mar. 9, 2022) (noting that "internal analyses provide persuasive valuation evidence" and that "AT&T's internal documents . . . provide strong

the notion that the recovered treasure alone requires valuing MEI far in excess of Dr. Margolin's valuation after running the assets through the Sliding Scale. MEI's investor slide deck, for example, states that the "[v]aluation of the company is set today at $200m[.]"[406] This collective valuation is also consistent with Sedwick's appraisal of MEI's value in the weeks following the Merger.

Indeed—less than a month after the Merger—Clifford wrote in an email to Sedwick that he believed Sedwick's valuation of "200 million, including coins, exhibits, real estate and hundreds of thousands of artifacts *is [a] very fair appraisal*."[407]

Defendants have also adopted a $10,000 per coin valuation in numerous of their internal documents.[408] Indeed, it appears Defendants have

---

evidence that the price was unfair"); *see also In re Appraisal of Regal Ent. Grp.*, 2021 WL 1916364, at *20 (Del. Ch. May 13, 2021) ("internal valuations carry an extra imprimatur of reliability"); *accord In re Columbia Pipeline Grp., Merger Litig.*, 299 A.3d 393, 497 (Del. Ch. 2023); *In re Mindbody, Inc., S'holder Litig.*, 2023 WL 7704774, at *10 n.98 (Del. Ch. Nov. 15, 2023).

[406] JX1034 at 31.

[407] JX0710 (emphasis added).

[408] JX0489 at 2 ("We establish the value of the coins. Their [*sic*] not going up for AUCTION . . . insured for 10,000 ea."); JX0386 ("10,000 coins @ 10,000"); JX1034 at 31 ("Approximately 15,000 Silver Whydah treasure coins will be set aside at an average value of $10,000 each for a total value of approximately $150m.").

even gone so far as to use such a valuation to secure a $5,000,000 non-recourse loan with 500 coins.[409] And, as of 2013, Defendants had insured over 400 coins in the Pirates I exhibit for between $10,000 and $20,000 each.[410] Likewise, Defendants appear to have insured the *Whydah*'s non-coin artifacts in amounts far exceeding Dr. Margolin's valuation. For example, as of 2011, Defendants had insured the *Whydah*'s bell alone "for $3,000,000"—in other words, for almost three times the value Dr. Margolin attempts to ascribe to *all* the *Whydah*'s treasure and artifacts.[411]

I am unable to square the numerous exhibits in the record on these issues with Dr. Margolin's underdeveloped valuation methodology and conclusion that the Whydah Joint Venture's revenues would not exceed the Sliding Scale's first rung.[412] Accordingly, for the reasons set forth above, I

---

[409] JX0630 (letter of intent stating that "[t]he Financing will be secured by five hundred (500) coins recovered from the wreck of the pirate ship *Whydah* . . ."); JX0638A (referencing the letter of intent in JX0630).

[410] *See* JX0385.

[411] JX0351 at 9. At that time, Defendants also appear to have insured the coins for $5,000 each. *Id.*

[412] I acknowledge the very real possibility that the rumored loot may turn out to be, like the contents of Al Capone's vault, non-existent. But—irrespective of the treasure that remains unrecovered—the value of the treasure and artifacts already salvaged also causes me to reject Dr. Margolin's valuation. Defendants insured the artifacts and treasure at values far exceeding Dr. Margolin's valuation. They made representations to investors and valuation experts to the same effect. And, as Clifford explained

reject Dr. Margolin's opinion as a basis for concluding the Merger price was fair. This conclusion is reinforced by Dr. Margolin's further failure to assess the cost to MEI's minority stockholders of extinguishing their interests in the potentially high value they stood to receive if, or when, MEI struck gold. The opportunity to participate in such a lucrative payout enticed risk-tolerant service providers and investors to contribute their time and resources to MEI in exchange for MEI's stock. Yet, as provided above, the Merger sought to extinguish that foundational bargaining chip without compensating the stockholders for it—an aim Defendants had repeatedly attempted to accomplish through their earlier machinations.

I must conclude, then, that Dr. Margolin's opinion does not satisfy Defendants' burden to show fair price.

### ii. Bergman

Next, Defendants argue they "relied upon Bergman's advice and subjectively believed that the Merger consideration was fair."[413] This reliance argument stems from Section 141(e) of the DGCL. Section 141(e) provides in its entirety that:

less than one month after the Merger, "[$]200 million . . . is [a] very fair appraisal." JX0710. Indeed, even if the treasure and artifacts are not worth $200 million, for the reasons I explained above, I remain highly skeptical that they are only worth $1.08 million, as Dr. Margolin suggests.

[413] Def's Post-Trial OB at 31.

114

A member of the board of directors, or a member of any committee designated by the board of directors, shall, in the performance of such member's duties, be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person as to matters the member *reasonably believes* are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation.[414]

Delaware courts have previously addressed the role good faith reliance on experts should play in conducting an entire fairness review. In those cases, the courts describe a "director's reliance on qualified experts under 8 *Del. C.* § 141(e)" as a "pertinent factor" in evaluating entire fairness.[415] But, they explain, "this factor alone is not dispositive" because "hold[ing] otherwise would replace the court's role in determining entire fairness . . . with that of various experts[.]"[416]

Here, Defendants' argument never gets off the ground. Considering Section 141(e) reliance as a factor first assumes a director's *reasonable reliance on a qualified expert.* But here, Defendants did not "reasonably

---

[414] 8 *Del. C.* § 141(e) (emphasis added).

[415] *Owen v. Cannon*, 2015 WL 3819204, at *31 n.329 (Del. Ch. June 17, 2015) (citations omitted) (quoting *Cinerama. Inc. v. Technicolor, Inc.,* 663 A.2d 1134, 1142 (Del. Ch. 1994), *aff'd*, 663 A.2d 1156 (Del. 1995) and *Valeant Pharm. Int'l v. Jerney,* 921 A.2d 732, 751 (Del. Ch. 2007)).

[416] *Id.*

believe[]" Bergman's expertise extended to valuation determinations on the Merger's fairness.[417] Indeed, Defendants themselves note that Bergman "advised Defendants to obtain a third-party valuation in connection with the Merger," which they did not do.[418]

These were not one-off conversations either. Bergman advised Defendants "a number of times" to get a third-party valuation.[419] In those conversations, Bergman explained "the entire fairness doctrine" and "the type of backup that is really required in order to support a demonstration of entire fairness, including an independent valuation, typically from a business valuer, an investment banker of some kind."[420] In providing this advice, Bergman clearly and repeatedly signaled to Defendants that he was not qualified as an expert and his personal expertise did not extend to the sort of valuations that would be appropriate under these circumstances. I conclude, then, that any reliance by Defendants on Bergman's personal belief the value of the Merger consideration was fair was not rooted in a reasonable belief

---

[417] *See* 8 *Del. C.* §141(e).

[418] Def's Post-Trial OB at 30.

[419] Bergman Dep. 173:6–176:20.

[420] *Id.*

that such a determination fell within Bergman's expertise. Accordingly, Rule 141(e) cannot save Defendants' unfair self-dealing.

Given these clear signals, even if I were to consider the alleged reliance as a factor, I would find it manifestly insufficient to satisfy Defendants' burden of showing fairness.

### iii. Subjective Belief

Likewise, Defendants' "subjective[] belie[f]" of fairness also cannot save them.[421] This Court has previously explained that "[n]ot even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs."[422]

Indeed, even if subjective belief were the test—which it is not—the record of contemporaneous documents shows Defendants would still fail in this regard. At least as it relates here, I have noted repeatedly that Defendants believed they were close to finding the rumored loot. The Merger seemed only to be the final piece of the puzzle—locking the minority stockholders into, what was in effect, the lowest rung of the Sliding Scale. This is foundationally inconsistent with Defendants' assertion that they

---

[421] Def's Post-Trial OB at 31.

[422] *New Enter. Assocs.*, 292 A.3d at 159 (quoting *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006)).

subjectively believed the Merger was fair. Defendants position on this issue is further belied by Clifford's email to Sedwick less than a month after the Merger, in which he stated his belief that $200 million "is [a] very fair appraisal."[423]

Accordingly, I conclude that Defendants have not met their burden of showing the Merger was entirely fair. They have conceded that the process was not fair and they have not shown the price fell within a range of fairness. And indeed, the evidence in the record shows the price was not fair and the Merger did not put MEI's minority stockholders in a better, or even substantially the same, place than they were before the Merger. I turn then to the appropriate remedy for this unfair self-dealing transaction.

## C. Remedies

In the SAC and Pre-Trial Stipulation, Plaintiff requested money damages, the cancellation of all stock issued as part of the Merger, and "such other relief as the Court deems just, equitable, and proper."[424] Here, equitable rescission of the Merger is the appropriate remedy.

---

[423] JX0710.

[424] SAC at 29–30; Pre-Trial Stip. ¶¶ 63–74.

"Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly."[425] "The court has broad discretion to award rescission where the facts and circumstances warrant."[426] And indeed, "[t]he Delaware Supreme Court has referred to rescission as the 'preferable' (but not the exclusive) remedy for breaches of fiduciary duty when rescission can restore the parties to the position they occupied before the challenged transaction."[427] In Delaware courts, "rescission frequently is granted where self-dealing transactions are found not to be entirely fair."[428]

---

[425] *Carlson v. Hallinan*, 925 A.2d 506, 540 (Del. Ch. 2006).

[426] *Tornetta*, 310 A.3d at 546; *see Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *49 (Del. Ch. July 6, 2018) ("In determining damages, the powers of the Court of Chancery are very broad in fashioning equitable and monetary relief under the entire fairness standard as may be appropriate."), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019).

[427] *Tornetta*, 310 A.3d at 448 (citing *Lynch v. Vickers Energy Corp.*, 429 A.2d 497, 501 (Del. 1981), *overruled on other grounds by Weinberger*, 457 A.2d at 701).

[428] *Zutrau v. Jansing*, 2014 WL 3772859, at *26 (Del. Ch. July 31, 2014), *aff'd*, 123 A.3d 938 (Del. 2015); *see also Tornetta*, 310 A.3d at 546–47 ("This court has awarded rescission as a remedy for breach of fiduciary duty, particularly in the context of self-dealing transactions."); *Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *49 ("When defendant fiduciaries have failed to satisfy the entire fairness test and have breached their duty of loyalty, 'the stockholders may . . . demand rescission of the transaction . . . .'").

"Rescission requires that all parties to the transaction be restored to the *status quo ante, i.e.,* to the position they occupied before the challenged transaction."[429]

Here, canceling the stock issued in the Merger and rescinding the Merger would place all parties in the positions they were in before the Merger. That is, Plaintiff and MEI's other pre-Merger minority stockholders would be returned to their pre-Merger cumulative holding of roughly 49% of MEI. Likewise, Defendants would return to their roughly 51% holding in MEI and their complete ownership of International.

Here, no party has demonstrated any reliance by third parties on the Merger's completion or significant untangling that rescission might require. Put another way, it is not impractical, or difficult even, to unscramble these eggs.

Indeed, at post-trial oral argument, Defendants' counsel agreed "that if any equitable relief would have been appropriate on this merger, it would

---

[429] *Strassburger v. Earley*, 752 A.2d 557, 578 (Del. Ch. 2000) (citation omitted); *see also Tornetta*, 310 A.3d at 546 ("[R]escission 'restore[s] the parties substantially to the position which they occupied before making the contract.'"); *Norton v. Poplos*, 443 A.2d 1, 4 (Del. 1982) ("[T]he equitable remedy of rescission results in abrogation or 'unmaking' of an agreement, and attempts to return the parties to the status quo.").

have been rescission."[430] Defendants' counsel also explained that canceling the stock issued as part of the Merger would put Defendants "back to their premerger position."[431]

Defendants have failed to show the Merger—a product of their clear self-dealing—is entirely fair. I conclude in this context that rescinding the Merger is a reasonable and appropriate remedy. Given the clear adequacy of rescission in this case and the parties' own amenableness to the use of this equitable remedy, I enter judgment rescinding the Merger.

## III.  CONCLUSION

For the foregoing reasons, I enter judgment in Plaintiff's favor on the Merger claim. Defendants prevail on the non-Merger claims and theories of liability. The parties are to confer on a form of final order implementing this decision and to submit a joint letter advising the Court of any issues that may remain to be addressed.

---

[430] Post-Trial Oral Argument 41:24–42:2.

[431] *Id*. at 133:1–18.